IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| VANESSA HALDEMAN & | ) | CV NO 05-00810 DAE-KSC |
| BENJAMIN HALDEMAN, BY | ) | |
| THEIR PARENTS *AS NEXT* | ) | |
| *FRIENDS*; JOSEPH & DENISE | ) | |
| HALDEMAN; JOSEPH | ) | |
| HALDEMAN, individually; | ) | |
| DENISE HALDEMAN, | ) | |
| individually; JERRY HALDEMAN, | ) | |
| individually; & CAROL | ) | |
| HALDEMAN, individually, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| RUTH GOLDEN, in her individual | ) | |
| capacity; PATRICIA NAVARRO, in | ) | |
| her individual capacity; CAROLINE | ) | |
| HAYASHI, in her individual | ) | |
| capacity; CYNTHIA NOEL, in her | ) | |
| individual capacity; UNIVERSITY | ) | |
| OF NATIONS PRE-SCHOOL, a | ) | |
| Private Agency; THE UNIVERSITY | ) | |
| OF NATIONS as Respondeat | ) | |
| Superior; ALEXANDER GRAVES, | ) | |
| in his individual capacity; COUNTY | ) | |
| OF HAWAII, a municipal entity; | ) | |
| KAREN DUTY, in her individual | ) | |
| capacity; DONALD CUPP, in his | ) | |
| individual capacity; JILL ACERO, in | ) | |
| her individual capacity; BOBBETTE | ) | |
| STRAUSS, in her individual | ) | |
| capacity; CHILD PROTECTIVE | ) | |
| SERVICES, an agency of the | ) | |
| Department of Human Services; | ) | |

DEPARTMENT OF HUMAN                          )
SERVICES [DHS], State of Hawaii;            )
LILLIAN KOLLER, DIRECTOR                    )
OF DHS, in her official capacity;          )
ANDREA MCCOLLUM, in her                     )
individual and professional capacity;       )
LEGAL AID SOCIETY OF                        )
HAWAII, a Private Non-Profit                )
Agency; DAVID KAULIA, in his               )
individual capacity; COLLEEN                )
CLARK, in her individual and               )
professional capacity; CHILD AND           )
FAMILY SERVICE, a Private Non-             )
Profit Agency; JOINTLY AND                  )
SEVERALLY,                                  )
                                            )
              Defendants.                   )
_____             )


### ORDER GRANTING IN PART AND DENYING IN PART
### DEFENDANT KAREN DUTY'S MOTION FOR SUMMARY JUDGMENT

The Court heard the Defendant Karen Duty's motion on February 25, 2008.  William Deeley, Esq., and John Winnicki, Esq., appeared at the hearing on behalf of Plaintiffs; John R. Molay, and Candace Park, Deputy Attorneys General, appeared at the hearing on behalf of Defendant Karen Duty; Joseph K. Kamelamela, Deputy Corporation Counsel, appeared at the hearing on behalf of Defendant Alexander Graves; Julie A. Passa and Maura M. Okamoto, Deputy Attorneys General, appeared at the hearing on behalf of Defendant Donald Cupp;

2

E. Mason Martin, III, Esq., and H. Shan Wirt, Esq., appeared at the hearing on behalf of Defendants Ruth Golden, Patricia Navarro, Caroline Hayashi, Cynthia Noel, University of Nations Pre-School, and The University of the Nations; Jeffrey S. Masatsugu, Esq., appeared at the hearing on behalf of Defendant David Kaulia; and John P. Gillmor, Michael S. Vincent, and Ryan S. Endo, Deputy Attorneys General, appeared at the hearing on behalf of Defendant Jill Acero.  After reviewing the motion and the supporting and opposing memoranda, the Court GRANTS IN PART AND DENIES IN PART Defendant Duty's Motion for Summary Judgment.  Duty is entitled to immunity on the state law tort claims for only some of her conduct.  Likewise, Duty is entitled to qualified immunity on the federal claims brought pursuant to 42 U.S.C. § 1983 as to only some of her conduct.  With respect to the conspiracy claim, Plaintiff has presented enough facts to survive summary judgment based on an alleged conspiracy between Duty and Cupp to present fabricated evidence to Family Court.

<u>BACKGROUND</u>

In 2002, Defendant Karen Duty was employed as a supervisor of the West Hawaii Assessment Unit in the Child Welfare Services Branch of the Social Services Division of the State of Hawaii Department of Human Services ("DHS").  Duty does not have a degree in social work and she is not licensed or certified by a

state as a social worker.  Duty does, however, have a Bachelor of Sciences degree in Criminal Justice and an Associates Degree in Applied Science for Correctional Technology from the University of Toledo.  Prior to being a supervisor, Duty worked for five and one-half years as an investigator for DHS.

In 2002, then four-year-old Vanessa Haldeman attended preschool at the University of Nations Preschool.  According to notes taken by preschool personnel, in May 2002, Vanessa exposed her private area during nap-time and also exposed her private area to a boy and asked him to do the same.  In July 2002, Vanessa pulled down her underpants and asked another girl to do the same.  On July 17, 2002, Vanessa asked a young boy to touch her private area.  Director Ruth Golden of the University of Nations Preschool contacted Child Protective Services of the State of Hawaii's Department of Human Services ("CPS") that same day.  CPS did not start an investigation.

On October 9, 2002, Denise Haldeman, Vanessa's mother, reported to the preschool that her daughter had been exposed to pornography on the Internet, which depicted oral sex.  On October 11, 2002, Vanessa asked a boy to look under her dress and her underwear was pulled down.  On October 15, 2002, Vanessa forced a girl's head into her lap.  On October 18, 2002, Vanessa asked other children to take their underpants off.  There is a dispute as to whether the preschool

4

staff discussed each of these behaviors with Vanessa's parents, or informed them that they had occurred.  According to the preschool, they informed Denise Haldeman of at least some of the behavior and she responded that Vanessa and her eight-year-old brother Benjamin bathed together, and that she would stop that.

On October 23, 2002, Vanessa's teacher, Carol Hayashi, came into Golden's office because Vanessa allegedly stated that she wanted to tell her a secret.  Vanessa told Golden and Hayashi that her daddy had shown her his tinkler, he had sucked on her private areas, and asked her to suck on his private areas.  She also told Golden and Hayashi that her mommy tells her to stay away from daddy and not to talk about it because it is potty talk.  Golden made notes of this conversation and contacted CPS.

On October 24, 2002, Duty and another Defendant, Hawaii Police Detective Alexander Graves ("Graves"), went to the preschool and met with Golden and Hayashi.  Golden and Hayashi informed Duty and Graves that Vanessa had exposed her genitals to classmates on a number of occasions, invited a boy to look under her dress and had been found with the boy's head under her dress with her underpants down, forced another girl's head onto her lap, and invited other children to take off their underpants.  This conduct had been witnessed by various different teachers and documented in a notebook kept by the preschool, which

5

predated the call to CPS by several months.  Duty and Graves did not interview each of the teachers who directly witnessed the alleged conduct that was noted in the notebook.  Golden and Hayashi also informed Duty that Vanessa had told preschool employees that her father did not wear clothes at night and showed his tinkler often and that Vanessa had told her mother about her father exposing himself to her and her mother's response was to not talk about it.  Golden also indicated that Vanessa's mother stated that Vanessa and her eight-year old brother Benjamin took baths together.  There are no recordings or notes of this conversation between Duty, Graves, Golden, and Hayashi.

Based on this information, Detective Graves took Vanessa into custody and transferred custody to Duty.  While at the preschool, Duty spoke to Vanessa.  Duty claims she told Vanessa that they would be going to another location to talk and that no interview took place at the preschool.  Although Plaintiffs point out that Duty spoke to Vanessa at the preschool, they do not allege that she said anything improper at this time.

By directive from Duty, Defendant Donald Cupp went to Benjamin Haldeman's school and picked him up.  Duty had told Cupp that there was a concern that Vanessa was being sexually molested by their father and that their mother was not being protective.  Duty then drove herself and Vanessa to the

Children's Justice Center for the purpose of conducting the interview. Duty claims that during the drive she did not interview Vanessa. In the transcript of the interview, Duty acknowledges that she and Vanessa spoke in the car. Vanessa, who at the time of her declaration was almost nine years old, claims that during the drive, Duty talked to her about "suck," "private parts," "secrets," "daddy" and "mommy." Duty disputes the truth of this statement, but argues that it is immaterial to her motion for summary judgment. There are no notes or recordings of the conversation in the car.

At the Center, Duty talked to Vanessa while she gave her a tour of the Center. No notes were made of this discussion. However, Plaintiffs do not assert that Duty said anything improper to Vanessa during this period, other than that Vanessa was shown the interview room and the two-way mirror and she knew that Detective Graves would be watching her. Duty then interviewed Vanessa alone, with Defendants social worker Donald Cupp and Detective Graves observing from another room. The interview was video taped and Plaintiffs have reviewed it. During the interview, Vanessa told Duty that: 1) she does not have a daddy, 2) her daddy died, 3) her daddy lives in a different house, 4) her sister "Keana" died years ago, 5) she has told lies since she was a little girl, 6) her daddy told a lie, 7) he told her to suck his private part, 8) she didn't do it and she told on her daddy, 9) he

asked her to do that five times, 10) it really hurt her feelings and she didn't want her dad to go into her room because he might put his private part on all her toys and "stuck on them with it, um, lil', little mouth," 11) her daddy put his mouth on a toy horse, 12) her daddy put his tinkler on her nose, 13) he touched her private part with his finger, 14) he put his boogers in her nose to get sick, 15) her body felt better when her daddy was touching her private part, and 16) a little booger that is teeny and looks yellow came out of daddy's tinkler.  Vanessa identified a drawing of a penis as a tinkler and a drawing of a little girl's genitalia as private parts.[1]

During the above portion of the interview, through questions posed, Duty introduced the concepts of telling the truth versus lying, inside versus outside of Vanessa's private parts, and whether her daddy's tinkler was "hard or squishy."

Approximately 40 minutes into the interview, after Vanessa had provided the answers set forth above, Duty placed the earpiece that she had been wearing into Vanessa's ear.  Duty had been wearing the earpiece during the interview so that she could hear any questions that Graves or Cupp may have. Duty placed the earpiece into Vanessa's ear after Vanessa had stated "so you can hear in your ears?".  Duty does not consider the placing of the earpiece in Vanessa's ear to have been a breach of protocol in the conduct of the interview.

─────────────────────

[1]Vanessa has a living father, and never had a sister.

Immediately prior to placing the earpiece in Vanessa's ear, Duty had asked Vanessa whether daddy's tinkler feels hard or squishy and Vanessa stated that she wanted to finish soon. Duty stated that she wanted to have Vanessa help her to understand what happened so that Duty could help her and help her daddy. Graves spoke to Vanessa through the earpiece for approximately 35 seconds. Cupp testified that Graves told Vanessa that she was doing a good job. While Graves was speaking to Vanessa, she said "yeah" a few times, "okay," and "I know that." Vanessa claims that the man who spoke to her through the earpiece told her to say "my daddy, " "suck," "private parts," "private touching," and "tinkler." No notes were made of this conversation. After speaking to Graves through the earpiece, Duty asked for the earpiece back and said "so what'd he tell you?" Vanessa responded that "um, he kinda, um kinda, touched my private part into his um, um, private part?" Duty responded "Who . . . wha . . .Who said . . .What was that?" Vanessa responded "[h]e kind of touched me into my little private part and it hurt bad." Duty believed that Vanessa was picking up the conversation where they had left off, prior to the earpiece being placed in her ear. Plaintiffs believe that Vanessa was stating what Graves had told her to say.

The interview continued using anatomically correct dolls so that Vanessa could demonstrate what happened. Vanessa stated that: 1) her daddy put

9

his tinkler in her private part, 2) he went to church with no clothes on and her sister came, 3) her mommy touched her private part, 4) her brother has a tinkler, 5) her daddy wants her to die because he does not like her, 6) her daddy put his private part into her private part, and it felt gross, 7) she takes baths with her brother, 8) she wanted to finish the interview soon, 9) she feels safe with mommy and daddy, 10) her daddy put his mouth on her private part, 11) she wanted to finish the interview quickly, 12) she wanted the interview to be over.  Despite Vanessa's requests to end the interview, Duty questioned her for approximately 15 to 20 more minutes.  Duty admitted that she should have ended the interview earlier.  She states "in my opinion, I should have ended it already.  All the significant information was already disclosed by the child.  And at this point she's tired and very likely just saying whatever so it can be over with. . . ."

During this portion of the interview, through questions posed, Duty introduced the concepts of feeling safe with mommy and daddy, her mother possibly witnessing her father touching her private parts, daddy touching her brother's private parts, whether Vanessa was worried about her daddy getting in trouble, and her daddy telling her not to tell anyone.  Duty also introduced the term secret.  Duty recognized during the interview, before it was over, that Vanessa seemed like she was getting tired.

Benjamin Haldeman was then interviewed by Detective Graves.  A review of Benjamin's interview shows that he told Detective Graves that: 1) everything is fine at home, 2) hugs, pats, and kisses occur at home, 3) only bad touching at home is spankings, 4) there is no private touching other than being helped by his parents with cleaning his private areas in the bathtub, 5) he bathes with Vanessa, and sometimes his mom or his dad, 6) there is no private touching between he and Vanessa, 7) he does not see private touching with anyone else in the home, 8) Vanessa talks about private touching to their mom during the bath and after the bath, for example, Vanessa takes her clothes off and "she plays with her business" and "talks gross talk" "like look at my butt," 9) he has never seen his father engage in private touching with Vanessa, 10)Vanessa has never told him about their father doing private touching, 11) he has helped Vanessa clean herself sometimes, 12) he only touched her private areas when he walked on her butt when he got mad at her, 13) Vanessa once lifted up his private parts, she was just playing, and he asked her to stop it and said that is gross, and she would not stop, 14) he has not seen Vanessa touch anyone else's private parts, 15) the term "potty talk" means gross stuff like "butt head, butt face, butt ears," 16) he and Vanessa use "potty talk," but his mom and dad do not use "potty talk," 17) his dad uses the word tinkler, his mom uses the word penis, he taught Vanessa to say weiner, but he

11

normally calls it tinkler, 18) he has heard his sister talk about a tinkler, 19) he has a good house, 20) sometimes at home he feels uncomfortable when he has to put wart medicine on his warts, 21) he and his sister and mom saw an email that had naked pictures of adults on the computer and his mom said do not look at the pictures and she tried to change the email address and get the pictures off of the computer, 22) his dad walks around naked, and 23) his dad does not care if the family sees his private parts when he is getting dressed because they are all family.

Plaintiffs claim that Duty observed the interview of Benjamin and that she spoke with Graves through a microphone during the interview five separate times. Plaintiffs, however, do not allege that Duty said anything improper to Benjamin. Duty states that she does not recall observing the interview. According to Duty, she was later advised by Cupp that Benjamin stated the following: he was aware that his father touched Vanessa on her private parts, Vanessa had told their mother and she advised Vanessa not to discuss it any further, Vanessa told Benjamin that their father had shaken his tinkler over her, Vanessa and Benjamin take baths and showers together, their father walks around with his private parts showing, and Vanessa would play with Benjamin's private parts even after he asked her to stop.

12

Detective Graves requested that a sexual assault nurse examiner conduct a colposcopic genital exam of Vanessa.  There was no court order or parental consent for this examination.  No injuries were found to Vanessa's genitalia and her hymen was found intact.  However, the nurse noted in her report that such a finding did not rule out sexual abuse.

Based upon the information provided by the staff at the preschool, Vanessa's interview statements, and Benjamin's interview statements, Cupp, in consultation with Duty, concluded that Vanessa had been sexually abused by her father.  Duty approved Cupp's decision to assume temporary foster custody of the children and file a petition with the Family Court.  According to Duty, DHS Guidelines require an immediate face-to-face contact with an alleged child victim to assess safety.  This includes interviewing the child victim, interviewing siblings, the non-offending parent, and the alleged offender, and a medical exam if it was warranted, and then make a determination for the family.  Despite these guidelines, Duty did not call or talk to the children's mother, Denise Haldeman, prior to making the determination that Vanessa had been sexually molested by her father.  Duty continued to supervise Cupp's work on the Haldeman case until it was transferred from her unit to a different DHS unit in mid-November 2002.

13

At approximately 6:00 p.m. on the day of the interviews, Cupp informed the parents that their children were in the custody of CPS and that Vanessa had accused her father, Joseph Haldeman, of sexual molestation, and CPS had confirmed the abuse and that Denise had failed to protect Vanessa.  On October 25, 2002, Joseph and Denise Haldeman met with Cupp.  Cupp again stated that Vanessa had disclosed, and CPS confirmed, sexual abuse by Joseph and that Denise had failed to protect her.  Cupp asked the parents to cooperate and enter into a Family Service Plan, which included for Joseph an admission to being a child sex abuser, enrollment in sex offender treatment, taking parenting classes, and submitting to a psychological evaluation, among other things, and for Denise, an admission to failing to protect Vanessa, various therapy sessions, and parenting classes and treatment.  The Haldeman parents stated that they believed the process was unfair, that they wished CPS would have talked to them, and that they would sue Cupp, CPS, and the preschool.

On October 29, 2002, CPS/DHS filed a Petition for Temporary Custody in the Family Court of the Third Circuit.  In the Petition filed with the Family Court, signed by Cupp and Duty,[2] Cupp stated that Benjamin stated in his

---

[2]  The Family Court filings were signed by another employee, on behalf of Duty.

14

interview that Vanessa told him about her "secret" about the private touching, and

that when Vanessa told their mother about the secret, their mother told Vanessa

that it is "potty talk."  As set forth above, this Court has reviewed the transcript of

Benjamin's interview and does not find these statements present in the transcript of

the interview.  Cupp further stated that DHS had confirmed sex abuse of Vanessa

by her father and threatened harm of Benjamin and Vanessa by their parents.

Other than the interviews of the children mentioned above, Cupp did not explain

the basis for this statement.  Cupp stated that Denise and Joseph Haldeman had

retained an attorney who advised them not to talk to CPS and that they refused to

be interviewed.  Cupp did not explain that CPS had made its decision and tried to

implement the Family Service Plan without having previously interviewed the

parents.  Cupp also filed a Safe Family Home Report in the Family Court.  The

report again provides that Benjamin stated that Vanessa told their mother her secret

about the private touching and their mother said that is "potty talk" and to stop it.

Cupp also stated that Benjamin confirmed that his sister told him that their father

had shaken his tinkler over her.  Again, this Court cannot find anywhere in the

transcript of Benjamin's interview where he stated that Vanessa told him their

father shakes his tinkler over her.  In the instant motion, Duty continues to allege

that Benjamin confirmed these parts of Vanessa's testimony.  Duty, however, cites

to Cupp's deposition as her support for this corroboration of testimony, rather than to Benjamin's interview.

The Family Court held a hearing on the petition on October 31, 2002. On December 12, 2002, the Family Court issued an order awarding temporary foster custody of the children, effective October 31, 2002.  The order states that DHS shall provide videotapes of the interviews of the children to the parents no later than November 8, 2002, and that a there will be a contested adjudication hearing on December 27, 2002.  Neither party has indicated to this Court whether the Family Court reviewed the interview videotapes or read the transcripts prior to making the custody decision, or if the Family Court relied mainly on Cupp's version of Benjamin's interview.

In November 2002, Joseph Haldeman underwent a polygraph lie detector test during which he was directly questioned as to whether he had specifically put his mouth on Vanessa's vaginal area, or his penis in her mouth and other such questions based on Vanessa's allegations.  Joseph denied all of Vanessa's allegations and the polygraph examiner found him to be truthful.

Duty was expected to attend a case conference meeting concerning the Haldeman family on December 12, 2002, where various persons involved, including Cupp and Graves, would discuss their up-to-date involvement in the

case.  Handwritten notes of the meeting indicate that she was present.  Duty was also expected to attend a case conference in early April 2003.  Duty does not recall actually attending either of these meetings.

Duty testified in Family Court on January 9, 2003.  In May 2003, Jerry and Carol Haldeman, the children's grandparents, filed a petition requesting to be appointed co-guardians.  In October 2003, the Family Court appointed the children's grandparents as co-guardians.  The Haldeman family moved and in November 2003, the case was transferred to the department of human services in Washington State.

In April 2004, Duty received instructions from the prosecuting attorney regarding her possible testimony at the criminal case against Joseph Haldeman.  The instructions stated that she should not use the words "victim," "molestation," or "CPS."  Duty was not called to testify in the criminal case.  In June 2004, following a trial, two of the three criminal charges against the father were dismissed and the third resulted in a hung jury.  The prosecutor did not retry the father on the remaining count.  The family custody proceeding terminated in October 2005, when the family court in Washington State dismissed all proceedings against the parents and returned custody of the children to them.

In May 2004, CPS received a report that Vanessa had been sexually abused by her former foster father, David Kaulia. Duty assigned Nicole Vahia to the case. Duty and Vahia attempted to locate the Haldeman children for an interview. They were unable to locate the Haldeman children and closed the case because they were unable to locate the alleged victims. Duty and Vahia prepared an Institutional Abuse Investigation Report. Duty attended a case conference regarding the Haldeman children and the allegation against David Kaulia on May 28, 2004. Duty attended two more case conferences, one on May 28, 2005, and the other on June 24, 2005.

On December 28, 2005, Plaintiffs filed a Complaint against Defendants, which was amended on August 31, 2006 ("Amended Complaint"). The Amended Complaint alleges Constitutional violations pursuant to 42 U.S.C. § 1983 and various state law claims. On December 12, 2006, this Court dismissed Denise and Joseph Haldeman's section 1983 claim against Duty on statute of limitations grounds. On February 13, 2007, this Court dismissed Denise and Joseph Haldeman's state law tort claims on the same grounds. Vanessa and Benjamin Haldeman have brought the following claims against Defendant Duty: 1) Fourth and Fourteenth Amendment violations pursuant to 42 U.S.C. § 1983 for unlawful seizure, conducting an improper interview of Vanessa Haldeman, causing

18

Vanessa to undergo an intrusive medical exam, fabricating evidence and coercing and threatening other parties to provide false evidence in Family Court proceedings, due process violations for lack of a pre-deprivation hearing and seizing the children without probable cause or exigent circumstances, and equal protection violations based on fraudulent prosecution in the Family Court and criminal court, (Count One); 2) conspiracy to violate civil rights pursuant to 42 U.S.C. § 1983 (Count Two); 3) negligence and gross negligence (Counts Four and Five); 4) Defamation (Count Six); 5) intentional infliction of emotional distress ("IIED") (Count Seven); and 6) invasion of privacy (Count Ten).

On December 17, 2007, Defendant Duty filed the instant motion for summary judgment (Doc. # 742).  Plaintiffs filed their opposition on February 7, 2008 (Doc. # 801), and Duty filed her reply on February 13, 2008 (Doc. # 805).

## STANDARD OF REVIEW

Rule 56 requires summary judgment to be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Porter v. Cal. Dep't of Corrections, 419 F.3d 885, 891 (9th Cir. 2005); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  A

main purpose of summary judgment is to dispose of factually unsupported claims

and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to

demonstrate facts to establish what will be an essential element at trial.  See id. at

323.  A moving party without the ultimate burden of persuasion at trial–usually,

but not always, the defendant–has both the initial burden of production and the

ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire &

Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden

initially falls upon the moving party to identify for the court those "portions of the

materials on file that it believes demonstrate the absence of any genuine issue of

material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d

626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the

nonmoving party "must set forth specific facts showing that there is a genuine

issue for trial" and may not rely on the mere allegations in the pleadings.  Porter,

419 F.3d  at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

(1986)).  In setting forth "specific facts," the nonmoving party may not meet its

burden on a summary judgment motion by making general references to evidence

without page or line numbers.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885,

20

889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary judgment, the court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties."). "[A]t least some 'significant probative evidence'" must be produced. T.W. Elec. Serv., 809 F.2d at 630 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." Addisu, 198 F.3d at 1134.

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." T.W. Elec. Serv., 809 F.2d at 631. In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. Porter, 419 F.3d at 891. The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage. Id. However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. T.W. Elec. Serv., 809 F.2d at 631.

DISCUSSION

21

Duty claims that she is entitled to absolute immunity for any state law claims arising out of her duties and responsibilities that she assumed pursuant to Hawaii Revised Statutes Chapter 587.  Duty also argues she is entitled to absolute immunity for the section 1983 claims arising out of her conduct of filing and prosecuting the dependency petition.  Duty further asserts that she is entitled to qualified immunity for claims arising out of the manner in which she interviewed Vanessa, the detention of the Haldeman children, and the medical examination of Vanessa.  Finally, Duty argues that she is entitled to summary judgment on Plaintiffs' claims of a conspiracy to falsify evidence.

Plaintiffs assert that Duty is not entitled to any immunity and that the following issues preclude summary judgment on their claims: 1) Duty made a decision to seize the Haldeman children before she interviewed the teachers who witnessed Vanessa acing out in a sexualized manner at the preschool; 2) Duty did not attempt to discover whether the teachers had encouraged, reinforced, or shaped Vanessa's behavior; 3) Duty talked to Vanessa at the preschool, but did not interview her at the school; 4) Duty did not ask the preschool teachers these four questions: a) how often the behavior occurred; b) what do the preschool teachers do when the behavior occurs; c) does Vanessa act this way anywhere else; and d) how do the parents respond when informed of her sexualized behavior; 5) no

22

reasonable social worker would have believed that Vanessa was in imminent

danger at this point, and there were no emergency or exigent circumstances for

removing Vanessa from the preschool; 6) likewise, there were no emergency or

exigent circumstances for Duty to instruct Donald Cupp to seize Benjamin; 7) Duty

coached Vanessa to talk about "suck" "private part" and "secrets" during the drive

to the Center, talked to Vanessa at the Center prior to the interview, and no notes

were made of either conversation; 8) Duty is unaware of the research and

published studies pertaining to various issues in the arena of interviewing children,

such as deception in three- and four-year-old children; 9) during the interview,

Duty introduced concepts that did not originate from Vanessa; 10) Duty allowed an

off-the-record conversation between Graves and Vanessa, during which Vanessa

claims that Graves coached her to use the words "suck," "private part," "tinkler,"

and "private touching;" 11) Duty ignored three separate requests by Vanessa to end

the interview; 12) Duty's interview process was suggestive and coercive and she

should have known it would yield false information; 13) no reasonable investigator

would have believed that the children were in danger and continued the seizure of

the children; 14) Duty participated in Graves' interview of Benjamin; 15)

Benjamin's interview did not corroborate Vanessa's statements of sexual abuse by

her father; 16) no reasonable social worker would have continued the seizure of the

children; 17)  Duty met and conspired with the other defendants during the criminal-civil coordination meetings in 2002 to 2003 and conspired to continue to present fabricated evidence.

I.     State Law Claims, Counts Four, Five, Seven, and Ten

Duty argues that all of Plaintiffs' allegations used to support their state law claims of negligence, gross negligence, IIED, and invasion of privacy[3] involve her duties as a supervisor in the Child Welfare Services Branch of the Social Services Division of the State of Hawaii.  Defendant Duty asserts that all of her actions were taken under Chapter 587 proceedings, and thus, she is absolutely immune from being sued pursuant to Hawaii Revised Statute § 350-3.

Hawaii Revised Statute § 350-3 provides that "[a]ny individual who assumes a duty or responsibility pursuant to section 350-2 or chapter 587 shall have immunity from civil liability for acts or omissions performed within the scope of the individual's duty or responsibility."  Haw. Rev. Stat. § 350-3(b).  Chapter 587 establishes a comprehensive plan for the protection of children who have been abused or neglected, by investigating complaints of abuse, removing children from their parents' custody, placing children in foster care, and initiating further action in the Family Court, when warranted.  See Haw. Rev. Stat. § 587-21.  The issue

---

[3] Duty has not moved to dismiss Plaintiffs' defamation claim.

thus, is whether Defendant Duty was acting within the scope of her duties when she allegedly committed the state law torts at issue.

As stated in this Court's Order Granting in Part and Denying in Part Defendant Forbes' (fka Acero) Motion to Dismiss this case, employment cases regarding respondeat superior liability for an employer where an employee acting within the scope of employment commits a tort are helpful to this analysis.[4]  To determine whether a tort was committed within the scope of an employee's employment under Hawaii law, Hawaii courts follow the Restatement of Agency § 228, which provides that:

> (1) Conduct of a servant is within the scope of employment if, but only if:
> (a) it is of the kind he is employed to perform;
> (b) it occurs substantially within the authorized time and space limits; [and]
> (c) it is actuated, at least in part, by a purpose to serve the master[.] . . .

———————————————

[4]This Court is cognizant of the fact that the scope of employment cases and Restatement of Agency approach this issue from the standpoint of liability of the employer, rather than through a lens of qualified immunity for the individual employee's acts.  However, this Court finds such cases to be instructive, because the Hawaii Revised Statute at issue clearly states that the scope of employment is the pertinent question, and does not follow the line of cases regarding qualified immunity under 42 U.S.C. § 1983.  This Court is also cognizant of the fact that, in this case, the employer, DHS and CPS, have been dismissed because as State agencies, they are absolutely immune from suit pursuant to the Eleventh Amendment.

> (2) Conduct of a servant is not within the scope of
> employment if it is different in kind from that authorized,
> far beyond the authorized time or space limits, or too
> little actuated by a purpose to serve the master.

Wong-Leong v. Hawaiian Indep. Refinery, Inc., 879 P.2d 538, 543 (Haw. 1994).

"In determining the scope of employment, the applicable test is whether the

employee's conduct was related to the employment enterprise or if the enterprise

derived any benefit from the activity." Id. at 546.

The Restatement of Agency section 229 provides that "[t]o be within

the scope of the employment, conduct must be of the same general nature as that

authorized, or incidental to the conduct authorized."  Restatement of Agency 2d

§ 229 (1958).  The comments provide that

> a servant is authorized to do anything which is
> reasonably regarded as incidental to the work specifically
> directed or which is usually done in connection with such
> work . . . [a]lthough an act is a means of accomplishing
> an authorized result, it may be done in so outrageous or
> whimsical a manner that it is not within the scope of
> employment.

Restatement § 229 comments a and b.  Following the Restatement, the Hawaii

Supreme Court has noted that an act, "although forbidden, or done in a forbidden

manner, may be within the scope of employment . . . the ultimate question is

whether or not it is just that the loss resulting from the servant's acts should be

considered as one of the normal risks to be borne by the business [.]" <u>State v. Hoshijo ex rel. White</u>, 76 P.3d 550, 563 n.29 (Haw. 2003) (finding that the actions of a student manager of the state university basketball team in shouting racial slurs at a spectator at a basketball game was conduct within scope of employment because he was required to attend games, work on the bench, assist the team, it was foreseeable that he would interact with the public at games, and the handbook proscribed use of obscene or inappropriate language to spectators).

Hawaii Revised Statute section 587-21 provides:

(a) Upon receiving a report that a child is subject to imminent harm, has been harmed, or is subject to threatened harm, the department shall cause such investigation to be made as it deems to be appropriate. In conducting the investigation the department may:
>(1) Enlist the cooperation of appropriate law enforcement authorities for phases of the investigation for which they are better equipped . . . ; and
>(2) Interview a child who is the subject of an investigation without the prior approval of and without the presence of the child's family, including temporarily assuming protective custody of the child for the purpose of conducting the interview, if the action is deemed necessary and appropriate under the circumstances by the department and a police officer.

(b) Upon satisfying itself as to the course of action that should be pursued to best accord with the purpose of this chapter, the department shall: . . .

> (3) Assume temporary foster custody of the child pursuant to section 587- 24(a) and file a petition with the court under this chapter within three working days . . . after the date of the department's assumption of temporary foster custody of the child . . .

It is undisputed that Duty was assigned these responsibilities with respect to the Haldeman children.  Thus, clearly, acts or omissions allegedly committed by Duty while investigating the report of possible abuse by speaking with the preschool teachers (or failing to do so), receiving custody of Vanessa from Detective Graves, talking to Vanessa at the preschool and at the Center, interviewing Vanessa, and attending Benjamin's interview, are acts within the scope of her duties.  Certainly, as the assigned case worker, Defendant Duty was employed to perform such acts, each of those alleged acts occurred within her work time and space, and were performed to serve her employer.

The investigation at the preschool included an interview of one teacher and the director, both of whom directly witnessed the recent allegation made by Vanessa, and included a review of the notebook, which contained written reports of Vanessa acting in a sexualized manner.  This information was certainly sufficient to bring Vanessa in for an interview.  Plaintiffs have pointed to no policy or DHS guideline that was violated by not interviewing the teachers who

28

personally witnessed the earlier sexualized conduct by Vanessa, or by not asking whether Vanessa engaged in such conduct outside of school.  Indeed, there is no indication that any teachers at the school would know whether Vanessa engaged in such conduct outside of school.  Even if some teachers had been aware that Vanessa did not do so, it would not discount the story Vanessa had told to Golden and Hayashi or her previous documented sexualized conduct.  Furthermore, although Plaintiffs produced expert reports stating that the preschool had reinforced Vanessa's sexualized behavior by responding to it by letting her get special attention and play time in the Director's office, such information, if true, does not make Vanessa's statements that her daddy had shown her his tinkler, he had sucked on her private areas, and asked her to suck on his private areas, less concerning.  Moreover, in the background section of the expert report by Wakefield, Wakefield states only that Vanessa reported that her father showed her his penis, and it does not acknowledge that Vanessa stated that he had sucked on her private parts and asked her to suck his private area.  Indeed, it is possible that Duty could have breached her duties had she not brought Vanessa and Benjamin in for interviews.  See Williamson v. Basco , No. 06-00012, 2007 WL 4570496, at *6-7 (D. Haw. Dec. 31, 2007) (finding that Defendant Asato was entitled to immunity pursuant to HRS § 350-3 with respect to the plaintiff's IIED claim

29

because all of the plaintiff's claims against Asato, including the claim that Asato

failed to talk to the children's teachers, arose out of the performance of his duties

of investigating child abuse as a Child Protective Services employee).

   The allegations of "coaching" Vanessa in the car and misconduct

during the interview of Vanessa by introducing certain concepts, placing the

earpiece in her ear during an unrecorded session, and continuing the interview

despite Vanessa's requests to stop, amount to at most negligence.  Plaintiffs have

produced no evidence that such conduct was intentional or so outrageous as to no

longer be considered conduct serving the purposes of the employer.  Plaintiffs have

produced no evidence to show that any of the above conduct was outside of the

normal risks to be borne by DHS or CPS, or were outside of the same general

nature as that authorized, or incidental to the conduct authorized.  Indeed, Duty

testified in Family Court that the philosophy at the Children's Justice Center is

there are no secrets and it happens quite frequently that they let a child listen

through the earpiece.  There is no indication that CPS instructed Duty to conduct

interviews in a certain fashion, or as set forth by Plaintiffs' experts, and that Duty

breached that duty during the interview.  Neither is there any evidence that Duty

had a personal motive or intent to conduct a coercive interview.  See Luna v.

Meinke, 844 F. Supp. 1284, 1287-88 (N.D. Ill. 1994) ("An agent . . . is deemed to

have acted outside the scope of his or her employment if the employee commits certain acts 'that could not possibly be interpreted as the merely overzealous or ill-judged performance of his duties as agent.'") (citation omitted).

However, there are genuine issues of fact of whether the following conduct by Duty was within the scope of her employment: 1) deciding to assume temporary foster custody of both Vanessa and Benjamin, without having interviewed their mother, Denise Haldeman, in apparent contradiction to DHS guidelines; 2) approving claims that Benjamin had corroborated Vanessa's statements of abuse in the Family Court filings, when in fact he had not corroborated inappropriate physical touching, and/or making material omissions in such filings; 3) allegedly conspiring with Cupp to continue making such claims of corroboration; and 4) allowing an intrusive medical exam to be performed on Vanessa without prior consent of her at least her mother or a court order, or having interviewed her mother.[5]  See Wong-Leong, 879 P.2d at 543 ("Whether an employee is acting within the scope of his or her employment is ordinarily a question of fact to be determined in light of the evidence of the particular case.").

_____

[5]Duty states that Graves ordered the medical exam.  However, based on Duty's own understanding of the DHS guidelines, she had authority to order such exam, but she should have first interviewed at least Denise Haldeman before doing so.  Thus, there is a question of fact of whether Duty had authority to overrule Graves's decision, or whether her approval was necessary.

31

Indeed, it is possible that CPS would claim that social workers are not expected to engage in such conduct and that such conduct is not foreseeable.  See Grozdanich v. Leisure Hills Health Ctr., Inc., 25 F. Supp. 2d 953, 979 (D. Minn. 1998) ("Naturally, the more outrageous the employee's tortious act should be, the less likely it could be described as foreseeable, and the less likely that the employer could be required to assume responsibility for the act, as a general risk of the employer's business.").  This holding is supported by the legislative history of Hawaii Revised Statute 350-3.  The committee reports state that the committee believed that immunity for child protective services' social workers was necessary "as long as they act responsibly in the performance of their duties."  1986 Senate Journal, Stand. Comm. Rep. No. 597.

Therefore, Duty is entitled to immunity on the state law claims for only some of her actions, as outlined above.

II.    Section 1983 Claims, Counts One and Two

A.    Absolute Immunity

Defendant Duty argues that she is entitled to absolute immunity as to Plaintiffs' claims pursuant to 42 U.S.C. section 1983 arising out of the filing and prosecution of the petition in Family Court, and her alleged failure to explore

32

exculpatory evidence, because she was performing a quasi-judicial function, akin to a prosecutor, in that role.

The United States Supreme Court has recognized absolute immunity from suit alleging violations of 42 U.S.C. § 1983 for a variety of persons who perform functions that are integral to the judicial process. See Briscoe v. LaHue, 460 U.S. 325, 342 (1983). Absolute judicial immunity protects such persons "from any damage action in the performance of their duties. Under this theory, absolute immunity precludes the imposition of any liability on the alleged wrongdoers, regardless of how wrongful that person's conduct may have been." Seibel v. Kemble, 631 P.2d 173, 177 (Haw. 1981). However, "the presumption is that qualified rather than absolute immunity is sufficient . . . and [the Supreme Court] [has] been quite sparing in [their] recognition of absolute immunity." Burns v. Reed, 500 U.S. 478, 486-478 (1991). The party asserting entitlement to absolute immunity, in this case, Duty, bears the burden of establishing the justification for such immunity. Antoine v. Byers & Anderson, Inc., 408 U.S. 429, 433 (1993).

Whether a person is entitled to absolute immunity is not analyzed merely by their position title, but instead rests on the type of function that they are performing. Briscoe, 460 U.S. at 342 n.28 (citing Imbler v. Pachtman, 424 U.S. 409, 430-431 (1976) (reserving the question whether a prosecutor, who is

33

absolutely immune for decisions to initiate a prosecution or put witnesses on the stand, has similar immunity for administrative or investigative tasks) and <u>Hampton v. City of Chicago</u>, 484 F.2d 602, 608 (7th Cir. 1973) (prosecutor's immunity ceases when he acts in a capacity other than his quasi-judicial role)); <u>see</u> <u>also</u> <u>Doe v. Lebbos</u>, 348 F.3d 820, 825 (9th Cir. 2003) (looking at the "nature of the function performed, not the identity of the actor who performed it.") (citation omitted) <u>overruled on other grounds by</u> <u>Beltran v. Santa Clara</u>, --- F.3d ----, No. 05-16976, 2008 WL 193319, at *2 (9th Cir. Jan. 24, 2008).

      With respect to social workers, the Ninth Circuit has held that "social workers are entitled to absolute immunity in performing quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings." <u>Meyers v. Contra Costa County Dept. of Social Servs.</u>, 812 F.2d 1154, 1157 (9th Cir. 1987).  This is because, like a prosecutor,

> [t]he social worker must make a quick decision based on perhaps incomplete information as to whether to commence investigations and initiate proceedings against parents who may have abused their children. The social worker's independence, like that of a prosecutor, would be compromised were the social worker constantly in fear that a mistake could result in a time-consuming and financially devastating civil suit.

<u>Id.</u>

In <u>Doe v. Lebbos</u>, relied upon by Duty, the plaintiffs contended that the social worker violated their constitutional rights by removing Lacey, a four-year-old girl, from her father's custody, inadequately investigating allegations of abuse and neglect, fabricating evidence in support of the dependency petitions, and referring Lacey for a sexual abuse examination without parental consent or a court order.  348 F.3d at 822-23.  The Ninth Circuit found that the social worker was entitled to absolute immunity for allegedly failing to investigate adequately the allegations of abuse and neglect and for allegedly fabricating evidence in the dependency petitions she prepared for the court since such actions were part of the initiation and pursuit of child dependency proceedings.  <u>Id.</u> at 826.  Furthermore, the Ninth Circuit held that "as prosecutors and others investigating criminal matters have no absolute immunity for their investigatory conduct, a fortiori, social workers conducting investigations have no such immunity."  <u>Id.</u>; <u>see also</u> <u>Broam v. Bogan</u>, 320 F.3d 1023, 1028 (9th Cir. 2003) (finding that because the social worker was primarily acting as an investigator rather than an advocate, he was not entitled to absolute immunity).

The Ninth Circuit recently overruled that decision in part and held that although social workers have absolute immunity when they make decisions to institute dependency proceedings "<u>they are not entitled to absolute immunity from</u>

35

<u>claims that they fabricated evidence during an investigation or made false statements in a dependency petition</u> affidavit that they signed under penalty of perjury, because such actions aren't similar to discretionary decisions about whether to prosecute." <u>Beltran</u>, -- F3. --, 2008 WL 193319, at *1 (emphasis added).

Here, Plaintiffs claim that Cupp and Duty fabricated evidence that Benjamin had corroborated Vanessa's allegations of sexual abuse and that Duty misrepresented and omitted important parts of the interviews in the Family Court proceedings. As set forth above, this type of conduct, if true, is not subject to absolute immunity. Likewise, Duty's conduct in investigating the situation, including an alleged failure to explore exculpatory evidence, is not entitled to absolute immunity. Accordingly, Duty's argument fails, she is not entitled to absolute immunity for filing the petition since such filing included false statements.

B.     <u>Qualified Immunity</u>

Duty argues that she is entitled to qualified immunity for claims arising out her method of conducting the investigation, detention of the Haldeman children, and the medical examination conducted on Vanessa.

36

"To establish that a state official is personally liable in an action under 42 U.S.C. § 1983, a plaintiff must show that 'the official, acting under color of state law, caused the deprivation of a federal right.'" Spoklie v. Montana, 411 F.3d 1051, 1060 (9th Cir. 2005) (quoting Hafer v. Melo, 502 U.S. 21, 25 (1991)).  As long as the official's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," he or she has qualified immunity from civil liability under § 1983. Id.  The following must be determined in the analysis of a qualified immunity defense: "(1) what right has been violated; (2) whether that right was so 'clearly established' at the time of the incident that a reasonable officer would have been aware of its constitutionality; and (3) whether a reasonable public officer could have believed that the alleged conduct was lawful." Jensen v. City of Oxnard, 145 F.3d 1078, 1085 (9th Cir. 1998), cert. denied, 525 U.S. 1016 (1998).  "A particular right is 'clearly established' if the 'contours of [that] right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id.; see also Devereaux v. Abbey, 263 F.3d 1070, 1074 (9th Cir. 2001) ("In essence, at the first step, the inquiry is whether the facts alleged constitute a violation of the plaintiff's rights. If they do, then, at the second step, the question is whether the defendant could nonetheless have reasonably but erroneously believed that his or her conduct

37

did not violate the plaintiff's rights.") (citing <u>Saucier v. Katz</u>, 533 U.S. 194 (2001)).

The party asserting qualified immunity bears the burden of proving that the defense

applies.  <u>Benigni v. City of Hemet</u>, 879 F.2d 473, 479 (9th Cir. 1988).

Duty asserts that Plaintiffs' claims fail because there is no

constitutional right to have a interview of an alleged child-abuse victim conducted

in a particular manner.  The Ninth Circuit has held that

> there is no constitutional due process right to have child witnesses in a child sexual abuse investigation interviewed in a particular manner, or to have the investigation carried out in a particular way. Interviewers of child witnesses of suspected sexual abuse must be given some latitude in determining when to credit witnesses' denials and when to discount them, and we are not aware of any federal law-constitutional, decisional, or statutory-that indicates precisely where the line must be drawn. Consequently, mere allegations that Defendants used interviewing techniques that were in some sense improper, or that violated state regulations, without more, cannot serve as the basis for a claim under § 1983.

<u>Devereaux</u>, 263 F.3d at 1075 (9th Cir. 2001) (citations omitted).

However, there is a well established liberty interest of parents in the

custody of their children.  <u>See</u> <u>Campbell v. Burt</u>, 949 F. Supp. 1461, 1466 (D. Haw.

1996).  "There are few rights more fundamental in and to our society than those of

parents to retain custody over and care for their children, and to rear their children

as they deem appropriate."  Id. (citation and internal quotation marks omitted).

Indeed, the Ninth Circuit recently held that

> [p]arents and children have a well-elaborated
> constitutional right to live together without governmental
> interference.  The Fourteenth Amendment guarantees that
> parents will not be separated from their children without
> due process of law except in emergencies.  Officials
> violate this right if they remove a child from the home
> absent information at the time of the seizure that
> establishes reasonable cause to believe that the child is in
> imminent danger of serious bodily injury and that the
> scope of the intrusion is reasonably necessary to avert that
> specific injury.  The Fourth Amendment also protects
> children from removal from their homes absent such a
> showing.

Rogers v. County of San Joaquin, 487 F.3d 1288, 1294 (9th Cir. 2007) (citations

and internal quotation marks omitted).

Thus, this Court must first determine whether there was reasonable

cause to believe at the time of the initial seizure of each child, the time of the

medical exam search of Vanessa, and at the time the decision was made to continue

seizure of both children by transferring them to foster care, that both Vanessa and

Benjamin were in imminent danger of serious bodily injury.  If there was reasonable

cause at each of these steps, this Court must determine whether the scope of each

intrusion was reasonably necessary to avert that specific injury.

In addition, "there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government."  Devereaux, 263 F.3d at 1074-75. Where the false evidence comes only from one interview of a child, the plaintiff must,

> at a minimum, point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of [the alleged perpetrator] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.

Id. at 1076.

This Court must review what Duty was aware of at each important step in the case and whether her actions were based on reasonable cause.  First, it is clear to this Court that at the time of the initial seizure of both children from the schools, Duty had reasonable cause to believe that Vanessa and Benjamin were in imminent danger of serious bodily injury, and that the scope of the intrusion, an interview of each child, was reasonably necessary to avert any further possible sexual molestation.  Thus, Duty has qualified immunity for the initial seizures and interviews of the two children.

40

The allegations pertaining to conduct engaged in by Duty during the interview of Vanessa do not change the fact that Duty had reasonable cause to initially seize Vanessa and Benjamin and interview them.  That conduct does, however, shed light on whether it was reasonable for Duty to continue the seizure of both children after the interviews, and subject Vanessa to a medical exam, without a court order.

> [o]fficials, including social workers, who remove a child from its home without a warrant must have reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant.  Serious allegations of abuse that have been investigated and corroborated usually give rise to a reasonable inference of imminent danger sufficient to justify taking children into temporary custody if they might again be beaten or molested during the time it would take to get a warrant.

Rogers, 487 F.3d at 1294-95 (citations and internal quotation marks omitted).

Here, Vanessa's allegations constitute allegations of imminent serious bodily injury.  However, there are questions of fact of whether these allegations were properly investigated and corroborated prior to continuing the seizure of both children and ordering a medical exam of Vanessa without a court order, and whether it was reasonable to believe that both Benjamin and Vanessa would likely experience serious bodily harm in the time that would be required to obtain a

warrant.  Although the words used by Vanessa during the interview mirrored what she had reported to the preschool staff, Vanessa alleges that Duty coached her prior to the interview by repeating these words to her.  Also, although Vanessa provided statements of molestation during her interview prior to Duty placing the earpiece in her ear and prior to Vanessa stating that she was tired and wanted the interview to be over, Plaintiffs produced expert reports stating that introducing certain concepts, using affirmations, ignoring fantasy facts, and entering the interview without knowledge of the child's background and with a bias, violate established guidelines that are well known in the field, and lead to a suggestive interview with coerced and inaccurate responses.  Duty has not, at this stage, contested the credentials of these experts or their opinions.  Duty argues only that this Court is free to disregard them.  Although this may be true, this Court finds that these expert reports create a genuine issue of fact as to whether Duty's interview of Vanessa was so suggestive that Duty should have known it would lead to false responses.

Furthermore, Duty does not address why both children were likely to experience serious bodily harm in the time that would be required to obtain a warrant.  The children were seized on a weekday during school hours and the interviews of the children were not lengthy.  Therefore, it is possible that the courts were open and Duty could have attempted to obtain a warrant for the medical exam

of Vanessa and the continued seizure of the children before the end of the day and before the children would be sent home to their parents.

In addition, it is questionable whether a reasonable social worker would have made the decision to place both children into temporary custody prior to interviewing the non-offending parent, when there is no other corroboration of abuse. Likewise, there is a question of fact of whether there was reasonable cause to file a petition in Family Court. It is unclear whether the Family Court would have granted temporary custody of both Benjamin and Vanessa if it had been explained to the court that the important parts of the four-year-old's statements were not corroborated, and the decision was made to place the children in foster care prior to attempting to interview the non-offending parent.

With respect to the claims against Duty for the medical examination, Duty argues that Graves ordered the exam, and therefore, Plaintiffs cannot prove that she had the requisite personal participation. See Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002) ("In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation.").

Although this may be true, Plaintiffs have produced evidence that Duty had authority to order such exam and Duty has not explained if she approved of the

43

exam, or if she could have at least delayed it until she got a court order, parental consent, or continued the investigation.  Furthermore, Duty claims that such exam was reasonable because Vanessa's statements had been corroborated by her brother.  However, as set forth above, there is a question of fact of whether Duty should have known of his lack of corroboration either because she watched the interview, or because she was Cupp's supervisor and thus, his knowledge is imputed to her.

Likewise, there is a question of fact of whether Duty conspired with Cupp to produce fabricated evidence.  Duty argues that the conspiracy claim applies only to being charged with a crime and therefore, does not apply in this context.  However, making false statements in a dependency petition with the intent that the court rely on it, causing the parents to temporarily lose custody, seriously infringes on a parent's constitutional rights.  See Beltran, 2008 WL 193319, at *1 (no absolute immunity where a social worker "fabricated evidence during an investigation or made false statements in a dependency petition affidavit.").  Although Duty does not recall attending meetings, Plaintiffs presented documents showing that she was expected to attend such meetings and that Cupp was to be present also.  In addition, it is undisputed that Duty eventually approved the petition filed in the Family Court, which appears to have material misstatements of fact.  Therefore, Plaintiffs' conspiracy claim survives this summary judgment motion.

44

<u>CONCLUSION</u>

For the reasons stated above, this Court GRANTS IN PART AND

DENIES IN PART Defendant Duty's Motion for Summary Judgment.  Duty is

entitled to immunity on the state law tort claims for only some of her conduct.

Likewise, Duty is entitled to qualified immunity on the federal claims brought

pursuant to 42 U.S.C. § 1983 as to only some of her conduct.  With respect to the

conspiracy claim, Plaintiff has presented enough facts to survive summary

judgment based on an alleged conspiracy between Duty and Cupp to present fabricated evidence to Family Court.

    IT IS SO ORDERED.

    DATED: Honolulu, Hawaii, February 27, 2008.



                 _____
                 David Alan Ezra
                 United States District Judge

Vanessa Haldeman, et al. vs. Ruth Golden, et al., Civil No. 05-00810 DAE-KSC; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT KAREN DUTY'S MOTION FOR SUMMARY JUDGMENT