IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| VANESSA HALDEMAN & BENJAMIN HALDEMAN, BY THEIR PARENTS *AS NEXT FRIENDS*; JOSEPH & DENISE HALDEMAN; JOSEPH HALDEMAN, individually; DENISE HALDEMAN, individually; JERRY HALDEMAN, individually; & CAROL HALDEMAN, individually, | ) ) ) ) ) ) ) ) ) ) | CV NO 05-00810 DAE-KSC |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| RUTH GOLDEN, in her individual capacity; PATRICIA NAVARRO, in her individual capacity; CAROLINE HAYASHI, in her individual capacity; CYNTHIA NOEL, in her individual capacity; UNIVERSITY OF NATIONS PRE-SCHOOL, a Private Agency; THE UNIVERSITY OF NATIONS as Respondeat Superior; ALEXANDER GRAVES, in his individual capacity; COUNTY OF HAWAII, a municipal entity; KAREN DUTY, in her individual capacity; DONALD CUPP, in his individual capacity; JILL ACERO, in her individual capacity; BOBBETTE STRAUSS, in her individual capacity; CHILD PROTECTIVE SERVICES, an agency of the Department of Human Services; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

DEPARTMENT OF HUMAN )
SERVICES [DHS], State of Hawaii; )
LILLIAN KOLLER, DIRECTOR )
OF DHS, in her official capacity; )
ANDREA MCCOLLUM, in her )
individual and professional capacity; )
LEGAL AID SOCIETY OF )
HAWAII, a Private Non-Profit )
Agency; DAVID KAULIA, in his )
individual capacity; COLLEEN )
CLARK, in her individual and )
professional capacity; CHILD AND )
FAMILY SERVICE, a Private Non- )
Profit Agency; JOINTLY AND )
SEVERALLY, )
                                                          )
                    Defendants. )
_____ )

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT DONALD CUPP'S MOTION FOR SUMMARY JUDGMENT

The Court heard the Defendant Donald Cupp's motion on April 14,

2008. (Doc. # 778). William Deeley, Esq., and John Winnicki, Esq., appeared at

the hearing on behalf of Plaintiffs; Julie A. Passa, Deputy Attorney General,

appeared at the hearing on behalf of Defendant Donald Cupp; John R. Molay,

Deputy Attorney General, appeared at the hearing on behalf of Defendant Karen

Duty; Joseph K. Kamelamela, Deputy Corporation Counsel, appeared at the

hearing on behalf of Defendant Alexander Graves and the County of Hawaii; E.

Mason Martin, III, Esq., appeared at the hearing on behalf of Defendants Ruth

Golden, Patricia Navarro, Caroline Hayashi, Cynthia Noel, University of Nations Pre-School, and The University of the Nations; and John P. Gillmor and Ryan S. Endo, Deputy Attorneys General, appeared at the hearing on behalf of Defendant Jill Acero; April Luria, Esq., appeared at the hearing on behalf of Defendants Child and Family Service ("CFS") and Colleen Clark; and William J. Nagle, Esq., appeared at the hearing on behalf of Defendants Bobbette Strauss and the Institute for Family Enrichment.  After reviewing the motion and the supporting and opposing memoranda, the Court GRANTS IN PART AND DENIES IN PART Defendant Donald Cupp's Motion for Summary Judgment.  Cupp is entitled to immunity on the state law tort claims for only some of his conduct.  Likewise, Cupp is entitled to qualified immunity on the federal claims brought pursuant to 42 U.S.C. § 1983 as to only some of his conduct.  With respect to the conspiracy claim, Plaintiffs have presented enough facts to survive summary judgment based on an alleged conspiracy between Defendants Karen Duty and Cupp to present fabricated evidence to Family Court.

BACKGROUND

In 2002, Defendant Donald Cupp was employed as a licensed social worker in the Child Protective Services Branch of the Social Services Division of the State of Hawaii Department of Human Services ("DHS") in Kailua-Kona,

Hawaii.  Cupp has an Associates Degree in Human Services from Honolulu Community College, a Bachelor of Science degree in Recreation from the University of Hawaii, and a Masters of Social Work degree from the University of Hawaii.

Many of the facts of this case are set forth in detail in this Court's Order Granting in Part and Denying in Part Defendant Karen Duty's Motion for Summary Judgment ("Duty Order") (Doc. # 817), some of which are repeated herein.  In 2002, then four-year-old Vanessa Haldeman attended preschool at the University of Nations Preschool, where beginning in May 2002, she started engaging in sexualized behavior.  For example, on separate occasions, she exposed her private area to a boy, pulled down her underpants, and asked a young boy to touch her private area.  Defendant Director Ruth Golden of the University of Nations Preschool contacted Child Protective Services of the State of Hawaii's Department of Human Services ("CPS") on July 17, 2002, regarding Vanessa's conduct.  CPS did not start an investigation.

On October 23, 2002, after a few other occasions of sexualized conduct by Vanessa, her teacher, Carol Hayashi, came into Golden's office with Vanessa and Vanessa repeated that her daddy had shown her his tinkler, he had sucked on her private areas, and asked her to suck on his private areas.  She also

4

told Golden and Hayashi that her mommy tells her to stay away from daddy and

not to talk about it because it is "potty talk."  Golden made notes of this

conversation and contacted CPS that day.

On October 24, 2002, Defendant social worker Karen Duty and

Defendant former Hawaii Police Detective Alexander Graves, went to the

preschool and met with Golden and Hayashi.  Golden and Hayashi informed Duty

and Graves of Vanessa's sexualized conduct and statements about her father.

Based on this information, Detective Graves took Vanessa into custody and

transferred custody to Duty.  By directive from Duty, Defendant Donald Cupp

went to pick up Vanessa's brother, Benjamin Haldeman, from his school.

Benjamin was eight years old at this time.  Duty had told Cupp that there was a

concern that Vanessa was being sexually molested by their father and that their

mother was not being protective.

Duty interviewed Vanessa at the Children's Justice Center (the

"Center"), and Cupp and Graves observed the interview from another room.  The

interview was video taped.  The interview is summarized in the Duty Order.

Benjamin Haldeman was then interviewed by Detective Graves.  A

review of Benjamin's interview shows that he told Detective Graves that: 1)

everything is fine at home, 2) hugs, pats, and kisses occur at home, 3) only bad

touching at home is spankings, 4) there is no private touching other than being helped by his parents with cleaning his private areas in the bathtub, 5) he bathes with Vanessa, and sometimes his mom or his dad, 6) there is no private touching between he and Vanessa, 7) he does not see private touching with anyone else in the home, 8) Vanessa talks about private touching to their mom during the bath and after the bath, for example, Vanessa takes her clothes off and "she plays with her business" and "talks gross talk" "like look at my butt," 9) he has never seen his father engage in private touching with Vanessa, 10)Vanessa has never told him about their father doing private touching, 11) he has helped Vanessa clean herself sometimes, 12) he only touched her private areas when he walked on her butt when he got mad at her, 13) Vanessa once lifted up his private parts, she was just playing, and he asked her to stop it and said that is gross, and she would not stop, 14) he has not seen Vanessa touch anyone else's private parts, 15) the term "potty talk" means gross stuff like "butt head, butt face, butt ears," 16) he and Vanessa use "potty talk," but his mom and dad do not use "potty talk," 17) his dad uses the word tinkler, his mom uses the word penis, he taught Vanessa to say weiner, but he normally calls it tinkler, 18) he has heard his sister talk about a tinkler, 19) he has a good house, 20) sometimes at home he feels uncomfortable when he has to put wart medicine on his warts, 21) he and his sister and mom saw an email that had

6

naked pictures of adults on the computer and his mom said do not look at the pictures and she tried to change the email address and get the pictures off of the computer, 22) his dad walks around naked, and 23) his dad does not care if the family sees his private parts when he is getting dressed because they are all family.

Cupp observed Benjamin's interview.  There is a question of fact of whether Duty also observed the interview.  According to Duty, she does not recall attending the interview, but does recall Cupp informing her that Benjamin stated the following:  he was aware that his father touched Vanessa on her private parts, Vanessa had told their mother and she advised Vanessa not to discuss it any further, Vanessa told Benjamin that their father had shaken his tinkler over her, Vanessa and Benjamin take baths and showers together, their father walks around with his private parts showing, and Vanessa would play with Benjamin's private parts even after he asked her to stop.  Some of these alleged statements, however, were not actually made by Benjamin in the interview.

Detective Graves requested that a sexual assault nurse examiner conduct a colposcopic genital exam of Vanessa.  There was no court order or parental consent for this examination.  The exam was conducted at approximately 3:30 p.m.  No injuries were found to Vanessa's genitalia and her hymen was found

intact.  However, the nurse noted in her report that such a finding did not rule out sexual abuse.

Based upon the information provided by the staff at the preschool, Vanessa's interview statements, and Benjamin's interview statements, Cupp, in consultation with Duty, concluded that Vanessa had been sexually abused by her father.  Duty approved Cupp's decision to assume temporary foster custody of the children and file a petition with the Family Court.  According to Duty, DHS Guidelines require an immediate face-to-face contact with an alleged child victim to assess safety.  This includes interviewing the child victim, interviewing siblings, the non-offending parent, and the alleged offender, and a medical exam if it was warranted, and then make a determination for the family.  Despite these guidelines, neither Duty nor Cupp called or talked to the children's mother, Denise Haldeman, prior to making the determination that Vanessa had been sexually molested by her father.  Cupp continued to work on the Haldeman case until it was transferred into a different DHS unit in mid-November 2002, where Defendant Jill Acero was assigned as case manager.

At approximately 6:00 p.m. on the day of the interviews, Cupp informed the parents that their children were in the custody of CPS and that Vanessa had accused her father, Joseph Haldeman, of sexual molestation, and CPS

8

had confirmed the abuse and that Denise had failed to protect Vanessa.  On

October 25, 2002, Joseph and Denise Haldeman met with Cupp.  Cupp again stated

that Vanessa had disclosed, and CPS confirmed, sexual abuse by Joseph and that

Denise had failed to protect her.  Cupp asked the parents to cooperate and enter

into a Family Service Plan, which included for Joseph an admission to being a

child sex abuser, enrollment in sex offender treatment, taking parenting classes,

and submitting to a psychological evaluation, among other things, and for Denise,

an admission to failing to protect Vanessa, various therapy sessions, and parenting

classes and treatment.  The Haldeman parents stated that they believed the process

was unfair, that they wished CPS would have talked to them, and that they would

sue Cupp, CPS, and the preschool.

On October 29, 2002, CPS/DHS filed a Petition for Temporary

Custody in the Family Court of the Third Circuit.  In the Petition filed with the

Family Court, signed by Cupp and Duty,[1] Cupp stated that Benjamin stated in his

interview that Vanessa told him about her "secret" about the private touching, and

that when Vanessa told their mother about the secret, their mother told Vanessa

that it is "potty talk."  As set forth above, this Court has reviewed the transcript of

---

[1] The Family Court filings were signed by another employee, on behalf of Duty.

Benjamin's interview and does not find these statements present in the transcript of

the interview.  Cupp further stated that DHS had confirmed sex abuse of Vanessa

by her father and threatened harm of Benjamin and Vanessa by their parents.

Other than the interviews of the children mentioned above, Cupp did not explain

the basis for this statement.  Cupp stated that Denise and Joseph Haldeman had

retained an attorney who advised them not to talk to CPS and that they refused to

be interviewed.  Cupp did not explain that CPS had made its decision and tried to

implement the Family Service Plan without having previously interviewed the

parents.  Cupp also filed a Safe Family Home Report in the Family Court.  The

report again provides that Benjamin stated that Vanessa told their mother her secret

about the private touching and their mother said that is "potty talk" and to stop it.

Cupp also stated that Benjamin confirmed that his sister told him that their father

had shaken his tinkler over her.  Again, this Court cannot find anywhere in the

transcript of Benjamin's interview where he stated that Vanessa told him their

father shakes his tinkler over her.  In addition, Cupp did not provide the court with

information that Vanessa made numerous statements in her interview that were

obviously false.

       The Family Court held a hearing on the petition on October 31, 2002.

Cupp testified at the Family Court hearing.  On December 12, 2002, the Family

Court issued an order awarding temporary foster custody of the children, effective October 31, 2002.  The order states that DHS shall provide videotapes of the interviews of the children to the parents no later than November 8, 2002, and that there will be a contested adjudication hearing on December 27, 2002.  Neither party has indicated to this Court whether Cupp was cross-examined at the hearing, whether the Family Court reviewed the interview videotapes or read the transcripts prior to making the custody decision, or if the Family Court relied mainly on Cupp's version of Benjamin's interview.

In November 2002, Joseph Haldeman underwent a polygraph lie detector test during which he was directly questioned as to whether he had specifically put his mouth on Vanessa's vaginal area, or his penis in her mouth and other such questions based on Vanessa's allegations.  Joseph denied all of Vanessa's allegations and the polygraph examiner found him to be truthful.

Cupp was expected to attend a case conference meeting concerning the Haldeman family on December 12, 2002, where various persons involved, including Graves and Duty, would discuss their up-to-date involvement in the case.  Cupp was also expected to attend a case conference in early April 2003 and on May 5, 2003.  Duty does not recall actually attending these meetings.

Joseph Haldeman was indicted on August 14, 2003, for sexual assault of a child in the first degree, sexual assault of a child in the third degree, and promoting child abuse in the first degree through producing pornographic material of a child.  Approximately three weeks later, the prosecution made a motion to withdraw the charge of  sexual assault in the first degree.  On September 15, 2003, the Circuit Court of the Third Circuit for the State of Hawaii approved the prosecution's withdrawal of the charge of sexual assault in the first degree.  A jury trial was held approximately eight months later, in May 2004, on the remaining two counts.  After the prosecution had presented its case-in-chief, but prior to the presentation of a defense, the court granted Joseph Haldeman's motion for judgment of acquittal on the charge of sexual assault in the third degree and Joseph Haldeman was so acquitted.  The charge of child pornography resulted in a mistrial.  On September 3, 2004, the court granted Joseph Haldeman's motion to dismiss that charge based upon the mistrial and prosecutor's failure to file for retrial of that charge.

In May 2004, Cupp received instructions from the prosecuting attorney regarding his possible testimony at the criminal case against Joseph Haldeman.  The instructions, which were also given to Duty, stated that he should

12

not use the words "victim," "molestation," or "CPS."  Neither Cupp nor Duty were called to testify in the criminal case.

The family custody proceeding terminated in October 2005, when the family court in Washington State dismissed all proceedings against the parents and returned custody of the children to them.

On December 28, 2005, Plaintiffs filed a Complaint against Defendants, which was amended on August 31, 2006 ("Amended Complaint"). The Amended Complaint alleges Constitutional violations pursuant to 42 U.S.C. § 1983 and various state law claims.  Plaintiffs have brought the following claims against Defendant Cupp:  1) Fourth and Fourteenth Amendment violations pursuant to 42 U.S.C. § 1983 for unlawful seizure of the Haldeman Children, conducting an improper interview of Vanessa Haldeman, causing Vanessa to undergo an intrusive medical exam, fabricating evidence, due process violations for lack of a pre-deprivation hearing and seizing the Haldeman Children without probable cause or exigent circumstances, and equal protection violations based on fraudulent and malicious prosecution in the Family Court and in criminal court against Joseph (Count One); 2) conspiracy to violate civil rights pursuant to 42 U.S.C. § 1983 (Count Two); 3) negligence and gross negligence (Counts Four and

Five); 4) Defamation (Count Six); 5) intentional infliction of emotional distress

(Count Seven); and 6) invasion of privacy (Count Ten).

On January 30, 2008, Defendant Cupp filed the instant motion for

summary judgment (Doc. # 778).  Plaintiffs filed their opposition on March 27,

2008, and Cupp filed his reply on April 4, 2008.  Defendant Alexander Graves

filed a joinder to part of Cupp's motion on January 31, 2008.  (Doc. # 789.)

Graves's joinder is discussed in a separate order regarding Graves's motion for

summary judgment.

<u>STANDARD OF REVIEW</u>

Rule 56 requires summary judgment to be granted when "the

pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(c); <u>see</u> <u>also</u> <u>Porter v. Cal. Dep't of Corrections</u>, 419 F.3d 885, 891 (9th

Cir. 2005); <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000).  A

main purpose of summary judgment is to dispose of factually unsupported claims

and defenses.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to

demonstrate facts to establish what will be an essential element at trial.  <u>See</u> <u>id.</u> at

323.  A moving party without the ultimate burden of persuasion at trial–usually, but not always, the defendant–has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  <u>Nissan Fire & Marine Ins. Co. v. Fritz Cos.</u>, 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls upon the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987) (citing <u>Celotex Corp.</u>, 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" and may not rely on the mere allegations in the pleadings.  <u>Porter</u>, 419 F.3d  at 891 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)).  In setting forth "specific facts," the nonmoving party may not meet its burden on a summary judgment motion by making general references to evidence without page or line numbers.  <u>S. Cal. Gas Co. v. City of Santa Ana</u>, 336 F.3d 885, 889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary judgment, the court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties.").  "[A]t least some 'significant probative evidence'" must be

produced.  T.W. Elec. Serv., 809 F.2d at 630  (quoting First Nat'l Bank of Ariz. v.

Cities Serv. Co., 391 U.S. 253, 290 (1968)).  "A scintilla of evidence or evidence

that is merely colorable or not significantly probative does not present a genuine

issue of material fact."  Addisu, 198 F.3d at 1134.

When "direct evidence" produced by the moving party conflicts with

"direct evidence" produced by the party opposing summary judgment, "the judge

must assume the truth of the evidence set forth by the nonmoving party with

respect to that fact."  T.W. Elec. Serv., 809 F.2d at 631.  In other words, evidence

and inferences must be construed in the light most favorable to the nonmoving

party.  Porter, 419 F.3d at 891.  The court does not make credibility determinations

or weigh conflicting evidence at the summary judgment stage.  Id.  However,

inferences may be drawn from underlying facts not in dispute, as well as from

disputed facts that the judge is required to resolve in favor of the nonmoving party.

T.W. Elec. Serv., 809 F.2d at 631.

DISCUSSION

I.    State Law Claims, Counts Four, Five, Seven, and Ten

Cupp argues that all of Plaintiffs' allegations used to support their

state law claims of negligence, gross negligence, IIED, and invasion of privacy

16

involve his duties as a social worker.[2]  Cupp argues that pursuant to Hawaii

Revised Statutes section 350-3, he is entitled to absolute immunity for any state

law claims arising out of his duties and responsibilities that he assumed pursuant to

Hawaii Revised Statutes Chapter 587.

      Hawaii Revised Statute § 350-3 provides that "[a]ny individual who

assumes a duty or responsibility pursuant to section 350-2 or chapter 587 shall

have immunity from civil liability for acts or omissions performed within the scope

of the individual's duty or responsibility."  Haw. Rev. Stat. § 350-3(b).  Chapter

587 establishes a comprehensive plan for the protection of children who have been

abused or neglected, by investigating complaints of abuse, removing children from

their parents' custody, placing children in foster care, and initiating further action

in the Family Court, when warranted.  <u>See</u> Haw. Rev. Stat. § 587-21.  As recently

discussed by the Hawaii Supreme Court, Hawaii Administrative Rule § 17-920.1-1

states that DHS "shall provide protective services immediately to a child who is the

subject of a report."  <u>See Kaho`ohanohano v. Dep't of Human Servs. State of</u>

_____

[2]  In his reply brief, Cupp argues for the first time that the defamation claim should be dismissed because he has a qualified privilege.  Pursuant to Local Rule 7.4, "[a]ny arguments raised for the first time in the reply shall be disregarded." However, even if Cupp had properly raised this issue in his motion, rather than in a reply brief, this Court would still be unable to determine as a matter of law whether a qualified privilege applies because neither party has cited to this Court which statements were made specifically by Cupp and under what context.

Haw., 178 P.3d 538, ___ (Haw. 2008) (page cites are unavailable).  Hawaii

Administrative Rule § 17-920.1-11(a) further provides that DHS "shall

immediately assess the validity of the report to provide appropriate services to the

child and family in accordance with the department's guidelines" and in so doing,

DHS must:

> (1) Evaluate the report or complaint to insure that it is
> based on fact;
> (2) Take action as soon as possible in order to provide
> immediate protection to the child;
> (3) Discuss the report or complaint directly with the
> parents, guardians, or custodians preferably through a
> home visit by: (A) Interpreting [DHS]'s services and
> legal authority to protect children; (B) Discussing
> specific reasons for [DHS]'s entry in the particular
> situation; (C) Evaluating whether the complaint is
> justified; and
> (4) Seeing the child as soon as possible to evaluate the
> extent to which the child is threatened with harm.

HAR § 17-920.1-11(e).

As stated in this Court's Order Granting in Part and Denying in Part

Defendant Forbes' (fka Acero) Motion to Dismiss this case, employment cases

regarding respondeat superior liability for an employer where an employee acting

within the scope of employment commits a tort are helpful to this analysis.[3]  To

---

[3]This Court is cognizant of the fact that the scope of employment cases and
Restatement of Agency approach this issue from the standpoint of liability of the
employer, rather than through a lens of qualified immunity for the individual

18

determine whether a tort was committed within the scope of an employee's

employment under Hawaii law, Hawaii courts follow the Restatement of Agency

Section 228, which provides that:

> (1) Conduct of a servant is within the scope of
> employment if, but only if:
> (a) it is of the kind he is employed to perform;
> (b) it occurs substantially within the authorized time and
> space limits; [and]
> (c) it is actuated, at least in part, by a purpose to serve the
> master[.] . . .
> (2) Conduct of a servant is not within the scope of
> employment if it is different in kind from that authorized,
> far beyond the authorized time or space limits, or too
> little actuated by a purpose to serve the master.

Wong-Leong v. Hawaiian Indep. Refinery, Inc., 879 P.2d 538, 543 (Haw. 1994).

"In determining the scope of employment, the applicable test is whether the

employee's conduct was related to the employment enterprise or if the enterprise

derived any benefit from the activity." Id. at 546.

The Restatement of Agency Section 229 provides that "[t]o be within

the scope of the employment, conduct must be of the same general nature as that

---

employee's acts. However, this Court finds such cases to be instructive, because
the Hawaii Revised Statute at issue clearly states that the scope of employment is
the pertinent question, and does not follow the line of cases regarding qualified
immunity under 42 U.S.C. § 1983. This Court is also cognizant of the fact that, in
this case, the employer, DHS and CPS, have been dismissed because as State
agencies, they are absolutely immune from suit pursuant to the Eleventh
Amendment.

authorized, or incidental to the conduct authorized." Restatement (Second) of

Agency § 229 (1958). The comments provide that

> a servant is authorized to do anything which is
> reasonably regarded as incidental to the work specifically
> directed or which is usually done in connection with such
> work . . . [a]lthough an act is a means of accomplishing
> an authorized result, it may be done in so outrageous or
> whimsical a manner that it is not within the scope of
> employment.

Restatement (Second) of Agency § 229 cmts. a and b. Following the Restatement,

the Hawaii Supreme Court has noted that an act, "although forbidden, or done in a

forbidden manner, may be within the scope of employment . . . the ultimate

question is whether or not it is just that the loss resulting from the servant's acts

should be considered as one of the normal risks to be borne by the business [.]"

State v. Hoshijo ex rel. White, 76 P.3d 550, 563 n.29 (Haw. 2003) (finding that the

actions of a student manager of the state university basketball team in shouting

racial slurs at a spectator at a basketball game was conduct within scope of

employment because he was required to attend games, work on the bench, assist

the team, it was foreseeable that he would interact with the public at games, and the

handbook proscribed use of obscene or inappropriate language to spectators).

Hawaii Revised Statute Section 587-21 provides:

(a) Upon receiving a report that a child is subject to imminent harm, has been harmed, or is subject to threatened harm, the department shall cause such investigation to be made as it deems to be appropriate. In conducting the investigation the department may:

    (1) Enlist the cooperation of appropriate law enforcement authorities for phases of the investigation for which they are better equipped . . . ; and

    (2) Interview a child who is the subject of an investigation without the prior approval of and without the presence of the child's family, including temporarily assuming protective custody of the child for the purpose of conducting the interview, if the action is deemed necessary and appropriate under the circumstances by the department and a police officer.

(b) Upon satisfying itself as to the course of action that should be pursued to best accord with the purpose of this chapter, the department shall: . . .

    (3) Assume temporary foster custody of the child pursuant to section 587- 24(a) and file a petition with the court under this chapter within three working days . . . after the date of the department's assumption of temporary foster custody of the child . . .

Applying the law set forth above, this Court found that Duty had qualified immunity for acts or omissions allegedly committed "while investigating the report of possible abuse by speaking with the preschool teachers (or failing to do so), receiving custody of Vanessa from Detective Graves, talking to Vanessa at

the preschool and at the Center, interviewing Vanessa, and attending Benjamin's interview[.]" (Duty Order at 28.)  This Court so held because these acts were within the scope of her duties, and Plaintiffs had not produced any evidence that "such conduct was intentional or so outrageous as to no longer be considered conduct serving the purposes of the employer" or that it was "outside of the normal risks to be borne by DHS or CPS, or . . . outside of the same general nature as that authorized, or incidental to the conduct authorized."  (Id. at 30.)  This Court also noted that there was no evidence that Duty had a personal motive or intended to conduct a coercive interview.  (Id.)  Thus, this Court found that the Plaintiffs' allegations of "misconduct during the interview of Vanessa by introducing certain concepts, placing the earpiece in her ear during an unrecorded session, and continuing the interview despite Vanessa's requests to stop, amount to at most negligence."  (Id.)

        Plaintiffs now assert that it was error by this Court to find that Duty's alleged misconduct during the interview of Vanessa amounted to at most negligence because that is a factual finding for the province of the jury and not this Court.[4]  Plaintiffs' argument is misplaced.  In order to determine whether Duty was

---

        [4] Although Plaintiffs believe that this Court erred, they did not file a motion requesting that this Court reconsider the Duty Order.

22

entitled to qualified immunity, this Court was charged with determining whether her conduct fell within the scope and duties of her employment. Plaintiffs failed to introduce any evidence which could show that Duty's action of taking an allegedly manipulative interview was above and beyond mere negligence such that it amounted to outrageous intentional conduct not intended to serve her employer, and therefore, outside the scope of Duty's job duties. As such, it was entirely appropriate for this Court to determine that there was no evidence from which one could infer that Duty's interview of Vanessa amounted to more than negligence. See Celotex Corp., 477 U.S. at 323-24 (summary judgment must be granted against a party who fails to demonstrate facts to establish what will be an essential element at trial); T.W. Elec. Serv., Inc., 809 F.2d at 630 (the non-moving party may not rely on the mere allegations in the pleadings and instead must set forth "specific facts showing that there is a genuine issue for trial").

Here, with respect to Cupp, Plaintiffs have again failed to produce any evidence from which it could be inferred that Cupp acted outside the scope of his duties with respect to seizing Benjamin and observing the interviews of both children, and failing to stop them. Accordingly, as with Duty, Cupp is entitled to qualified immunity for his acts of seizing Benjamin for the limited purpose of

conducting an interview, and from failing to stop Duty from continuing to conduct

and allegedly manipulative interview of Vanessa.

This Court found, however, that Duty was not entitled to qualified

immunity on the state law claims for the following acts because there was a

genuine issue of fact as to whether such conduct was beyond mere negligence,

such that it was not within the scope of her employment:

> 1) deciding to assume temporary foster custody of both
> Vanessa and Benjamin, without having interviewed their
> mother, Denise Haldeman, in apparent contradiction to
> DHS guidelines; 2) approving claims that Benjamin had
> corroborated Vanessa's statements of abuse in the Family
> Court filings, when in fact he had not corroborated
> inappropriate physical touching, and/or making material
> omissions in such filings; 3) allegedly conspiring with
> Cupp to continue making such claims of corroboration;
> and 4) allowing an intrusive medical exam to be
> performed on Vanessa without prior consent of at least
> her mother or a court order, or having interviewed her
> mother.

(Duty Order at 31.)

As with Duty, Cupp is likewise not entitled to qualified immunity for

1) deciding to assume temporary foster custody of both Vanessa and Benjamin,

without having interviewed their mother, Denise Haldeman, in apparent

contradiction to DHS guidelines; 2) stating that Benjamin had corroborated

Vanessa's statements of abuse in the Family Court filings, when in fact he had not

24

corroborated inappropriate physical touching, and/or making material omissions in such filings; 3) allegedly conspiring with Duty to continue making such claims of corroboration; and 4) allowing an intrusive medical exam to be performed on Vanessa without prior consent of at least her mother or a court order, or having interviewed her mother.[5]

Cupp has not addressed how conduct of alleged defamation is within his duties.  Accordingly, Cupp is not entitled to absolute immunity under Hawaii Revised Statute Section 350-3 for the defamation claim.

II.    Section 1983 Claims, Counts One and Two

A.    Absolute Immunity

1.    Filing the Family Court Petition and Report

Defendant Cupp argues that he is entitled to absolute immunity as to Plaintiffs' Section 1983 claims arising from his role in filing the Petition for Temporary Custody and other documents in Family Court because he was playing a critical role in the judicial process.

---

[5] Cupp states that he had no role in the decision to order the medical exam. However, based on Duty's understanding of the DHS guidelines, it appears that she and Cupp had authority to order such exam, but should have first interviewed at least Denise Haldeman before doing so.  Thus, there is a question of fact of whether Cupp and Duty had authority to overrule Graves's decision, or whether their approval was necessary for the exam.

"[T]he scope of absolute immunity for social workers is extremely narrow." Miller v. Gammie, 335 F.3d 889, 898 (9th Cir. 2003). The Ninth Circuit has held that "social workers are entitled to absolute immunity in performing quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings," to take custody away from parents. Meyers v. Contra Costa County Dept. of Social Servs., 812 F.2d 1154, 1157 (9th Cir. 1987). This is because, like a prosecutor,

> [t]he social worker must make a quick decision based on perhaps incomplete information as to whether to commence investigations and initiate proceedings against parents who may have abused their children. The social worker's independence, like that of a prosecutor, would be compromised were the social worker constantly in fear that a mistake could result in a time-consuming and financially devastating civil suit.

Id. In Miller, the court stated that

> it would appear that the critical decision to institute proceedings to make a child a ward of the state is functionally similar to the prosecutorial institution of a criminal proceeding. The decision, therefore, is likely entitled to absolute immunity. It also may be that some submissions to the court by social workers are functionally similar to the conduct recognized at common law to be protected by absolute prosecutorial immunity.

335 F.3d at 898 (citation omitted). The Ninth Circuit has recently definitively held, however, that although social workers have absolute immunity when they

26

make decisions to institute dependency proceedings "they are not entitled to absolute immunity from claims that they fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury, because such actions aren't similar to discretionary decisions about whether to prosecute."  Beltran v. Santa Clara, 514 F.3d 906, 908 (9th Cir. 2008).  The party asserting entitlement to absolute  immunity bears the burden of establishing the justification for such immunity.  Antoine v. Byers & Anderson, Inc., 408 U.S. 429, 433 (1993).

Duty made this same argument in her motion and based upon the Beltran case, this Court found that Duty was not entitled to absolute immunity for filing the petition in Family Court because such filing included statements that could be found to be knowingly false or misleading.  (Duty Order at 36.) Likewise, as Plaintiffs have demonstrated that the petition filed by Cupp in Family Court, at a minimum, gave the false impression that Benjamin had corroborated the important allegations of physical sexual abuse of Vanessa by her father and that the mother was aware of it and failed to protect Vanessa, Cupp is not entitled to qualified immunity for filing the Family Court petition and other such documents in the Family Court.  Therefore, Cupp's motion for summary judgment on this issue is DENIED.

27

2.   <u>In-Court Testimony</u>

Cupp argues that to the extent Counts 1 and 2 are based on providing in-court testimony or a conspiracy to harmonize in-court testimony and/or conspiracy to present perjured testimony at trial, he is absolutely immune from suit for such alleged conduct.  Plaintiffs state that they are not suing Cupp for his in-court testimony.

As this Court held in the Order Granting in Part and Denying in Part Defendant Forbes' (fka Acero) Motion to Dismiss, a witness not only has absolute immunity from liability for civil damages under Section 1983 for giving perjured testimony at trial, but also has "absolute immunity for conspiring to present her own and another witness's perjured testimony at trial."  <u>Franklin v. Terr</u>, 201 F.3d 1098, 1099 (9th Cir. 2000) (citing <u>Briscoe v. LaHue</u>, 460 U.S. 325, 326  (1983)). This is because allowing a claim for conspiracy to present false testimony would "undermine the purposes served by granting witnesses absolute immunity from damages liability under § 1983."  <u>Id.</u> at 1101.

Accordingly, Defendant Cupp is immune from suit to the extent Counts 1 and 2 are based upon conspiring to present false testimony and his motion on this issue is GRANTED.  As found in the Duty Order, however, this does not apply to the allegations that Cupp conspired with Duty to present

fabricated evidence to the Family Court.  See Cunningham v. Gates, 229 F.3d 1271, 1291 (9th Cir. 2000) ("[o]bviously, testimonial immunity does not encompass non-testimonial acts such as fabricating evidence.")

B.   Qualified Immunity

Cupp argues that he is entitled to qualified immunity for claims arising out of his investigation, the medical exam of Vanessa, and alleged fabrication of evidence, because there is no constitutional right to a perfectly drafted petition for custody, his conduct was reasonable, and the Family Court filings did not contain fabricated evidence, and at most contained inaccuracies.

In the Duty Order, this Court noted that there is a well established liberty interest of parents in the custody of their children.  See Campbell v. Burt, 949 F. Supp. 1461, 1466 (D. Haw. 1996); see also Rogers v. County of San Joaquin, 487 F.3d 1288, 1294 (9th Cir. 2007) ("[p]arents and children have a well-elaborated constitutional right to live together without governmental interference.  The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies.") (citations and internal quotation marks omitted).  Thus, Cupp's argument that there is no Constitutional right to a perfectly prepared Family Court petition is irrelevant because there is a clearly established Constitutional right for families to live

together, which may be violated where children are separated without due process and no emergency existed.

This Court also noted in the Duty Order that the Ninth Circuit held that State officials violate the right to custody of the children

> if they remove a child from the home absent information at the time of the seizure that establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.  The Fourth Amendment also protects children from removal from their homes absent such a showing.

Rogers, 487 F.3d at 1294.

Applying those principles, this Court found that Duty was entitled to qualified immunity as a matter of law with respect to the initial seizure of both children from the schools for the limited purpose of conducting forensic interviews.  This Court so held because there was no genuine issue of fact that based upon the seriousness of Vanessa's allegations and the ages of the young children, Duty had reasonable cause to believe that Vanessa and Benjamin were in imminent danger of serious bodily injury, and that the scope of the intrusion, an interview of each child, was reasonably necessary to avert any further possible sexual molestation.  Therefore, this Court found that Duty reasonably believed that a limited seizure of both children was lawful.

Plaintiffs, without having filed a motion for reconsideration on this issue, again assert that the above finding was in error because it is a question for the jury. Plaintiffs' argument is meritless because it is clearly within this Court's authority to determine whether a qualified immunity defense applies. <u>See Hemphill v. Kincheloe</u>, 987 F.2d 589, 592-93 (9th Cir. 1993) ("[i]f a reasonable official could have believed that his actions were lawful, summary judgment on the basis of qualified immunity is appropriate.") (citations omitted); <u>see</u> <u>also</u> <u>Act Up!/Portland v. Bagley</u>, 988 F.2d 868, 873 (9th Cir. 1993) ("The determination of whether the facts alleged could support a reasonable belief in the existence of probable cause or reasonable suspicion is also a question of law to be determined by the court") (citations omitted). Accordingly, like Duty, Cupp is also entitled to qualified immunity for the initial seizure of Benjamin for the purpose of conducting an interview.

However, this Court found that genuine issues of fact existed as to whether Duty should have qualified immunity for actions of continuing the seizure of both children after completing the interviews, and allowing a medical exam of Vanessa to be conducted without a court order, and whether it was reasonable to believe that both Benjamin and Vanessa would likely experience serious bodily

31

harm in the time that would be required to obtain a warrant.  Accordingly, these
genuine issues of fact exist as to Cupp's conduct as well.

Specifically, although Cupp asserts that he was not involved with
ordering the medical examination of Vanessa and that it was Graves who ordered
the exam, Plaintiffs have produced evidence that Cupp had authority to order such
exam.  Cupp has not denied that he was aware that such exam was ordered without
a court order or parental consent and that he did not object to the exam going
forward.  Neither has Cupp explained why a court order could not have been
obtained prior to conducting the medical exam.

Cupp next argues that he is entitled to qualified immunity for
statements made in the Family Court filings because those statements were mere
inaccuracies, not fabricated evidence.

As set forth in the Duty Order, "there is a clearly established
constitutional due process right not to be subjected to criminal charges on the basis
of false evidence that was deliberately fabricated by the government."  Devereaux
v. Abbey, 263 F.3d 1070, 1074-75 (9th Cir. 2001).  Likewise, making false
statements in a dependency petition with the intent that the court rely on it, causing
the parents to temporarily lose custody, seriously infringes on a parent's
constitutional rights.  See Beltran, 2008 WL 193319, at *1 (no absolute immunity

32

where a social worker "fabricated evidence during an investigation or made false

statements in a dependency petition affidavit.").  Where the false evidence comes

only from one interview of a child, the plaintiff must,

> at a minimum, point to evidence that supports at least one
> of the following two propositions: (1) Defendants
> continued their investigation of [the alleged perpetrator]
> despite the fact that they knew or should have known that
> he was innocent; or (2) Defendants used investigative
> techniques that were so coercive and abusive that they
> knew or should have known that those techniques would
> yield false information.

Devereaux, 263 F.3d at 1076.

Here, although some of the language that Plaintiffs take issue with in

the Family Court filings appear to be minor inaccuracies, there do exist omissions

of information and misstatements of fact in those filings which are sufficient to

create a genuine issue of fact of either whether Cupp continued to pursue foster

custody despite the fact that he should have known that Joseph and Denise

Haldeman were innocent, or whether Cupp should have known that Duty's

interview techniques were so coercive that they yielded false information.

Accordingly, Plaintiffs have provided enough evidence to survive summary

judgment on this issue.  It is for the jury to decide if those omissions and

misstatements are in fact fabrication of evidence.  Accordingly, Cupp is not

entitled to qualified immunity as a matter of law with respect to the claim for fabrication of evidence.

Cupp also argues that Plaintiffs' evidence does not rise to the level of a violation of Constitutional rights because they cannot show that the inclusion of inaccuracies in the Family Court filings rise to the level of deliberate indifference. Cupp argues that the inaccuracies are not conscience shocking, especially in light of the fact that he had to prepare the petition within three working days, without the luxury of a written transcript. This argument fails. Plaintiffs have produced enough evidence to create a question of fact of whether the statements made by Cupp in the Family Court filings were made with deliberate indifference. Although Cupp did not have a transcript, he had observed both interviews and they were videotaped.

For these reasons, Cupp's Motion is GRANTED IN PART AND DENIED IN PART on this issue.

C.     Conspiracy Claim

Cupp argues that Plaintiffs' civil conspiracy claim fails as a matter of law because Plaintiffs have not presented enough evidence from which it can be inferred that there was a meeting of the minds between him and Duty to violate Plaintiffs' Constitutional rights. This Court disagrees.

34

> A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage.  To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy.  A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions.

Gilbrook v. City of Westminster, 177 F.3d 839, 856-57 (9th Cir. 1999) (citations omitted).

As found in the Duty Order, there is enough evidence to survive summary judgment on the question of whether Duty and Cupp conspired to produce fabricated evidence in Family Court filings and proceedings.  A jury could infer from each of the Defendants' participation in the events giving rise to this case that Duty and Cupp reached a "unity of purpose or a common design" to present falsified evidence in the Family Court in order to support their decisions to allow a medical exam of Vanessa, and to continue to seize the Haldeman Children and place them in a foster home, without having first obtained a warrant from a

court, and/or interviewed Denise Haldeman.  Id.  ("Acts which seem otherwise innocent, when viewed in the context of the surrounding circumstances, may justify an inference of complicity.") (citation omitted).  Thus, Cupp's motion on this issue is DENIED.

        D.    <u>Punitive Damages</u>

Cupp asserts that he cannot be held liable for punitive damages pursuant to Hawaii Revised Statute section 662-2, and because there is no evidence that he acted with malice.

Hawaii Revised Statute section 662-2 provides that "[t]he State hereby waives its immunity for liability for the torts of its employees and shall be liable in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."  Cupp's argument regarding section 662-2 is meritless as that statue, by its terms, applies to liability of the State, not of an individual.  Although Cupp was a State employee, Cupp is being sued in his individual capacity.

Punitive damages may be awarded in a § 1983 case against an individual defendant "if the defendant's conduct is shown to be motivated by evil

motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983).

Plaintiffs have presented enough facts to create a genuine issue of whether Cupp acted in reckless disregard to Plaintiffs' Constitutional rights. Indeed, Cupp continued to allege that Benjamin corroborated Vanessa's statements of physical sexual abuse long after the transcripts of the interviews were made available and long after allegations were made that Benjamin did not corroborate such statements. Accordingly, Cupp's motion for summary judgment on this issue is DENIED.

## CONCLUSION

For the reasons stated above, this Court GRANTS IN PART AND DENIES IN PART Defendant Cupp's Motion for Summary Judgment. Cupp is entitled to immunity on the state law tort claims for only some of his conduct. Likewise, Cupp is entitled to qualified immunity on the federal claims brought pursuant to 42 U.S.C. § 1983 as to only some of his conduct. With respect to the conspiracy claim, Plaintiffs have presented enough facts to survive summary

judgment based on an alleged conspiracy between Duty and Cupp to present

fabricated evidence to Family Court.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, April 15, 2008.

_____
David Alan Ezra
United States District Judge

Vanessa Haldeman, et al. vs. Ruth Golden, et al., Civil No. 05-00810 DAE-KSC;
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT
DONALD CUPP'S MOTION FOR SUMMARY JUDGMENT