IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

VANESSA HALDEMAN &          )        CV NO 05-00810 DAE-KSC
BENJAMIN HALDEMAN, BY       )
THEIR PARENTS *AS NEXT*     )
*FRIENDS*; JOSEPH & DENISE  )
HALDEMAN; JOSEPH            )
HALDEMAN, individually;     )
DENISE HALDEMAN,            )
individually; JERRY HALDEMAN, )
individually; & CAROL       )
HALDEMAN, individually,     )
                            )
        Plaintiffs,         )
                            )
    vs.                     )
                            )
RUTH GOLDEN, in her individual )
capacity; PATRICIA NAVARRO, in )
her individual capacity; CAROLINE )
HAYASHI, in her individual  )
capacity; CYNTHIA NOEL, in her )
individual capacity; UNIVERSITY )
OF NATIONS PRE-SCHOOL, a    )
Private Agency; THE UNIVERSITY )
OF NATIONS as Respondeat    )
Superior; ALEXANDER GRAVES, )
in his individual capacity; COUNTY )
OF HAWAII, a municipal entity; )
KAREN DUTY, in her individual )
capacity; DONALD CUPP, in his )
individual capacity; JILL ACERO, in )
her individual capacity; BOBBETTE )
STRAUSS, in her individual  )
capacity; CHILD PROTECTIVE  )
SERVICES, an agency of the  )
Department of Human Services; )

DEPARTMENT OF HUMAN          )
SERVICES [DHS], State of Hawaii;  )
LILLIAN KOLLER, DIRECTOR    )
OF DHS, in her official capacity;  )
ANDREA MCCOLLUM, in her     )
individual and professional capacity;  )
LEGAL AID SOCIETY OF        )
HAWAII, a Private Non-Profit  )
Agency; DAVID KAULIA, in his  )
individual capacity; COLLEEN  )
CLARK, in her individual and  )
professional capacity; CHILD AND  )
FAMILY SERVICE, a Private Non-  )
Profit Agency; JOINTLY AND   )
SEVERALLY,                   )
                             )
            Defendants.       )
_____  )

### ORDER GRANTING IN PART AND DENYING IN PART
### DEFENDANT ALEXANDER GRAVES'S
### MOTION FOR SUMMARY JUDGMENT

On April 7, 2008, the Court heard Defendant/Cross-Claim Defendant

Alexander Graves's Motion for Summary Judgment.  (Doc. # 771).  William

Deeley, Esq., and John Winnicki, Esq., appeared at the hearing on behalf of

Plaintiffs; Joseph K. Kamelamela, Deputy Corporation Counsel, appeared at the

hearing on behalf of Defendant Alexander Graves and the County of Hawaii; Julie

A. Passa, Deputy Attorney General, appeared at the hearing on behalf of Defendant

Donald Cupp; John R. Molay, Deputy Attorney General, appeared at the hearing

on behalf of Defendant Karen Duty; E. Mason Martin, III, Esq., appeared at the

hearing on behalf of Defendants Ruth Golden, Patricia Navarro, Caroline Hayashi, Cynthia Noel, University of Nations Pre-School, and The University of the Nations; and John P. Gillmor, Michael S. Vincent, and Ryan S. Endo, Deputy Attorneys General, appeared at the hearing on behalf of Defendant Jill Acero; April Luria, Esq., appeared at the hearing on behalf of Defendants Child and Family Service and Colleen Clark; and William J. Nagle, Esq., appeared at the hearing on behalf of Defendants Bobbette Strauss and the Institute for Family Enrichment.  After reviewing the motion and the supporting and opposing memoranda, the Court GRANTS IN PART AND DENIES IN PART Defendant/ Cross-Claim Defendant Alexander Graves's Motion for Summary Judgment.

<u>BACKGROUND</u>

Defendant Alexander Graves was employed as a police officer by the County of Hawaii Police Department from December 1990 until he retired on December 31, 2002.  In 1997, Graves became a member of the Juvenile Aid Section, which was a newly-formed unit that investigated child abuse cases.  In 1999 through 2000, Graves received advanced training, which included training in investigating child abuse cases,  forensic interview training,[1] domestic violence

---

[1] A forensic interview is an interview of a child that is videotaped to be used for court purposes and occurs in a controlled, structured environment, and is done by a certified interviewer.  A field interview takes place at the scene and its

sexual assaults, and evidence collection.  Graves testified that in this forensic

training he covered a lot of material in a small amount of time.  In May 2000,

Graves was certified as a forensic interviewer by the Children's Justice Center.

Many of the facts of this case are set forth in detail in this Court's

Order Granting in Part and Denying in Part Defendant Karen Duty's Motion for

Summary Judgment ("Duty Order") (Doc. # 817.)  In 2002, then four-year-old

Vanessa Haldeman attended preschool at the University of Nations Preschool,

where beginning in May 2002, she started engaging in sexualized behavior.  For

example, on separate occasions, she exposed her private area to a boy, pulled down

her underpants, and asked a young boy to touch her private area.  Defendant

Director Ruth Golden of the University of Nations Preschool contacted Child

Protective Services of the State of Hawaii's Department of Human Services ("CPS"

or "DHS") on July 17, 2002, regarding Vanessa's conduct.  CPS did not start an

investigation at that time.

On October 23, 2002, after a few other occasions of sexualized

conduct by Vanessa, her teacher, Carol Hayashi, came into Golden's office with

Vanessa and Vanessa repeated that her daddy had shown her his tinkler, he had

sucked on her private areas, and asked her to suck on his private areas.  She also

---

purpose is to acertain basic facts.

told Golden and Hayashi that her mommy tells her to stay away from daddy and not to talk about it because it is potty talk.  Golden made notes of this conversation and contacted CPS that day.

On October 24, 2002, Graves and another Defendant, CPS social worker Karen Duty, went to the preschool and met with Golden and Hayashi. Golden and Hayashi informed Duty and Graves about Vanessa's sexualized conduct and gave Duty and Graves a notebook, in which these behaviors had been documented.  Duty and Graves did not interview each of the teachers who directly witnessed the alleged conduct that was detailed in the notebook.  Golden and Hayashi also informed Duty and Graves of Vanessa's allegations regarding sexual abuse by her father.

Based on this information, Detective Graves took Vanessa into custody and transferred custody to Duty.  Duty drove Vanessa to the Children's Justice Center for a forensic interview.  Another CPS social worker, Defendant Donald Cupp, picked up Vanessa's eight-year-old brother, Benjamin Haldeman, from his school.  Graves gave Benjamin a tour of the Center.  No notes or recordings were made of any discussion that may have occurred during this tour.

Duty then interviewed Vanessa alone, with Defendants Cupp and Detective Graves observing from another room.   Approximately 40 minutes into

5

the interview, Duty placed the earpiece that she had been wearing into Vanessa's ear.  Duty had been wearing the earpiece during the interview so that she could hear any questions that Graves or Cupp may have.  Duty placed the earpiece into Vanessa's ear after Vanessa had stated "so you can hear in your ears?".  Duty does not consider the placing of the earpiece in Vanessa's ear to have been a breach of protocol in the conduct of the interview.  Immediately prior to placing the earpiece in Vanessa's ear, Duty had asked Vanessa whether daddy's tinkler feels hard or squishy and Vanessa stated that she wanted to finish soon.  Duty stated that she wanted to have Vanessa help her to understand what happened so that Duty could help her and help her daddy.  Graves spoke to Vanessa through the earpiece for approximately 35 seconds.  Cupp and Graves testified that Graves told Vanessa that she was doing a good job and that the interview was almost over.  While Graves was speaking to Vanessa, she said "yeah" a few times, "okay," and "I know that." Vanessa claims that Graves told her to say "my daddy, " "suck," "private parts," "private touching," and "tinkler."  No notes were made of this conversation.  After speaking to Graves through the earpiece, Duty asked for the earpiece back and said "so what'd he tell you?"  Vanessa responded that "um, he kinda, um kinda, touched my private part into his um, um, private part?"  Duty responded "Who . . . wha . . .Who said . . .What was that?"  Vanessa responded "[h]e kind of touched me into

6

my little private part and it hurt bad." Duty believed that Vanessa was picking up the conversation where they had left off, prior to the earpiece being placed in her ear. Plaintiffs believe that Vanessa was stating what Graves had told her to say.

Benjamin Haldeman was then interviewed by Detective Graves. As noted in the Duty Order, Defendants Duty and Cupp claimed that Benjamin corroborated the sexual abuse of Vanessa by their father. However, although Benjamin corroborated certain statements made by Vanessa, this Court could not locate corroboration by Benjamin of the statements that alleged physical sexual abuse by their father had occurred.

After completing both interviews, Detective Graves requested that a sexual assault nurse examiner conduct a colposcopic genital exam of Vanessa. There was no court order or parental consent for this examination. No injuries were found to Vanessa's genitalia and her hymen was found intact. However, the nurse noted in her report that such a finding did not rule out sexual abuse.

Prior to Vanessa's allegations in 2002, in 2001, an employee of Costco sent photographs to the County of Hawaii police department, which depicted a female child who was asleep and her vagina was exposed. The photos were given to Sam Kawamoto, who was assigned to the sex assault division of JAS. At some point, the name Joe Haldeman was written onto the photo envelope. It is not clear

7

when the name Joe Haldeman was written on the envelope and whose handwriting it is. It is also unclear to this Court whether the face of female child is recognizable as Vanessa Haldeman, or whether any of the other photos in the roll of film were of the Haldeman family. Plaintiffs allege that the other pictures that were part of the developed roll of film were of people and places that they did not recognize. It is also unclear how many photos were part of the developed roll received by the police. Because the police were busy, not much was done with respect to these photos that had been received around the time that they were received in 2001.

On December 20, 2002, as part of his investigation of Vanessa's allegations, Graves received the photographs and the Costco film processing envelope, which had been maintained at the Honolulu Police Department since they had been sent by the Costco employee. From approximately December 20 to December 31, 2002, the evidence was held by Graves in a temporary evidence locker, to which there were three keys, one of which was held by Graves. Graves made copies of the photo envelope and scanned the photos into the computer to put onto a disk. Graves was unable to locate the negatives for the photos. The photos were shown to Denise Haldeman, the children's mother. Plaintiffs have alleged that these photos were used in the criminal prosecution against Joseph and that the photos had been adulterated by Graves or by someone else due to Graves's alleged

negligence regarding a chain of custody, and that the photos used in the prosecution were substantially different from those shown to Denise.

In December 2002, Graves, still attempting to locate the negatives for the photos, began to prepare a search warrant for the Haldeman's home.  Graves signed an affidavit on December 24, 2002, in order to obtain the warrant and a judge signed and issued the warrant.  Graves commenced a search of the Haldeman's home pursuant to the search warrant on December 27, 2002.  Although Graves did not have an arrest warrant, Joseph and Denise Haldeman were arrested.  Joseph Haldeman was charged with sex assault and child abuse, and was released later that same day.  Denise was also released later that day, but was not criminally charged.

On December 13, 2002, Graves conducted an audio taped interview of Vanessa.  On December 20, 2002, Graves received an evaluation by his superior, in which he was told that he needed to improve in all areas of investigation.  Graves retired on December 31, 2002, and moved to South Dakota.  Graves believed that his superior did not want him to attend domestic violence meetings and other training seminars.  After retiring, Graves burned all of his investigation notebooks, despite knowing that while he was an employee he was instructed to keep his notebooks.

Joseph Haldeman was indicted on August 14, 2003, for sexual assault of a child in the first degree, sexual assault of a child in the third degree, and promoting child abuse in the first degree through producing pornographic material of a child. Approximately three weeks later, the prosecution made a motion to withdraw the charge of sexual assault in the first degree. On September 15, 2003, the Circuit Court of the Third Circuit for the State of Hawaii approved the prosecution's withdrawal of the charge of sexual assault in the first degree. A jury trial was held approximately eight months later, in May 2004, on the remaining two counts. After the prosecution had presented its case-in-chief, but prior to the presentation of a defense, the court granted Joseph Haldeman's motion for judgment of acquittal on the charge of sexual assault in the third degree and Joseph Haldeman was so acquitted. The charge of child pornography resulted in a mistrial. On September 3, 2004, the court granted Joseph Haldeman's motion to dismiss that charge based upon the mistrial and prosecutor's failure to file for retrial of that charge.

The family custody proceeding terminated in October 2005, when the family court in Washington State dismissed all proceedings against the parents and returned custody of the children to them.

On December 28, 2005, Plaintiffs filed a Complaint against Defendants, which was amended on August 31, 2006 ("Amended Complaint").  The Amended Complaint alleges Constitutional violations pursuant to 42 U.S.C. § 1983 and various state law claims.  Plaintiffs have brought the following claims against Defendant Graves:  1) Fourth and Fourteenth Amendment violations pursuant to 42 U.S.C. § 1983 for unlawful seizure of all of the Plaintiffs at different times, conducting an improper interview of Vanessa Haldeman, causing Vanessa to undergo an intrusive medical exam, fabricating evidence, due process violations for lack of a pre-deprivation hearing and seizing the Plaintiffs without probable cause or exigent circumstances, and equal protection violations based on fraudulent and malicious prosecution in the Family Court and in criminal court against Joseph (Count One); 2) conspiracy to violate civil rights pursuant to 42 U.S.C. § 1983 (Count Two); 3) negligence and gross negligence (Counts Four and Five); 4) Defamation (Count Six); 5) intentional infliction of emotional distress (Count Seven); and 6) invasion of privacy (Count Ten).

On January 30, 2008, Defendant Graves filed the instant motion for summary judgment.  (Doc. # 771.)  Plaintiffs filed an opposition on March 20, 2008, and Graves filed a reply on March 27, 2008.

## STANDARD OF REVIEW

Rule 56 requires summary judgment to be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Porter v. Cal. Dep't of Corrections, 419 F.3d 885, 891 (9th Cir. 2005); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  A main purpose of summary judgment is to dispose of factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See id. at 323.  A moving party without the ultimate burden of persuasion at trial–usually, but not always, the defendant–has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls upon the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" and may not rely on the mere allegations in the pleadings.  Porter, 419 F.3d  at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). In setting forth "specific facts," the nonmoving party may not meet its burden on a summary judgment motion by making general references to evidence without page or line numbers.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary judgment, the court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties."). "[A]t least some 'significant probative evidence'" must be produced.  T.W. Elec. Serv., 809 F.2d at 630  (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)).  "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." Addisu, 198 F.3d at 1134.

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact."  T.W. Elec. Serv., 809 F.2d at 631.  In other words, evidence and

inferences must be construed in the light most favorable to the nonmoving party.

Porter, 419 F.3d at 891.  The court does not make credibility determinations or

weigh conflicting evidence at the summary judgment stage.  Id.  However,

inferences may be drawn from underlying facts not in dispute, as well as from

disputed facts that the judge is required to resolve in favor of the nonmoving party.

T.W. Elec. Serv., 809 F.2d at 631.

DISCUSSION

I.      Counts 1 and 2 (Section 1983 Claims)

Plaintiffs allege that Graves violated their constitutional rights by

seizing the Haldeman children, manipulating Vanessa into making false statements,

causing Vanessa to undergo an intrusive medical exam, seizing Joseph and Denise

Haldeman, and fabricating and adulterating photographic evidence against Joseph

to substantiate a false claim of sexual abuse.

A.      Absolute Immunity

Graves argues that to the extent Counts 1 and 2 are based on providing

in-court testimony or a conspiracy to harmonize in-court testimony and/or

conspiracy to present perjured testimony at trial, he is absolutely immune from suit

for such alleged conduct.  Plaintiffs state that they are not suing Graves for in-court

testimony.

14

As this Court held in the Order Granting in Part and Denying in Part

Defendant Forbes' (fka Acero) Motion to Dismiss, a witness not only has absolute

immunity from liability for civil damages under Section 1983 for giving perjured

testimony at trial, but also has "absolute immunity for conspiring to present her own

and another witness's perjured testimony at trial."  Franklin v. Terr, 201 F.3d 1098,

1099 (9th Cir. 2000) (citing Briscoe v. LaHue, 460 U.S. 325, 326  (1983)).  This is

because allowing a claim for conspiracy to present false testimony would

"undermine the purposes served by granting witnesses absolute immunity from

damages liability under § 1983."  Id. at 1101.

Accordingly, Defendant Graves is immune from suit to the extent

Counts 1 and 2 are based upon conspiring to present false testimony and his motion

on this issue is GRANTED.

B.     Statute of Limitations

Graves argues that Joseph and Denise Haldeman's (the "Adult

Plaintiffs") Section 1983 claim based upon unlawful arrest and seizure are barred

by the statute of limitations because they filed their complaint more than two years

after the search warrant was executed and the arrest and seizure were made.

Plaintiffs concede that a two-year statute of limitations period applies to their claim,

but argue that their claim did not begin to run on the date of the seizure, but instead began to run upon the dismissal of the criminal charges against Joseph.

"Because § 1983 does not contain a statute of limitations, federal courts apply the forum state's statute of limitations for personal injury claims." Johnson v. State of Cal., 207 F.3d 650, 653 (9th Cir. 2000).  The statute of limitations for claims for damage or injury to persons or property is two years. Haw. Rev. Stat. § 657-7.  Civil rights claims brought pursuant to 42 U.S.C. § 1983 are subject to the two-year statute of limitations under Hawaii law.  Pele Defense Fund v. Paty, 837 P.2d 1247, 1259 (Haw. 1992) ("the two-year statute of limitations set forth in HRS § 657-7 governs § 1983 actions, rather than the six-year statute of limitations set forth in HRS § 657-1(4)."); see also Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd., 509 F.3d 1020, 1026 (9th Cir. 2007) ("It is well-established that claims brought under § 1983 borrow the forum state's statute of limitations for personal injury claims").  The court must look to federal law, however, to determine when § 1983 accrues.  Wallace v. Kato,  127 S.Ct. 1091, 1095 (2007) ("the accrual date of a § 1983 cause of action is a question of federal law that is not resolved by reference to state law.").

Plaintiffs rely on a concurring opinion written by Justice Ginsberg in the Albright v. Oliver case, which states that

16

> Once it is recognized, however, that [the plaintiff] Albright remained effectively "seized" for trial so long as the prosecution against him remained pending, and that [the defendant] Oliver's testimony at the preliminary hearing, if deliberately misleading, violated the Fourth Amendment by perpetuating the seizure, then the limitations period should have a different trigger. The time to file the § 1983 action should begin to run not at the start, but at the end of the episode in suit, i.e., upon dismissal of the criminal charges against Albright.

Albright v. Oliver, 510 U.S. 266, 280 (1994).

The Supreme Court in a recent decision held, however, that the statute of limitations for a Section 1983 claim based upon a false arrest or false imprisonment begins to run on the date that individual appears before a judge and is bound over for trial.  Wallace, 127 S. Ct. at 1097 ("the statute of limitations on petitioner's § 1983 claim [for unlawful arrest] commenced to run when he appeared before the examining magistrate and was bound over for trial.").  Using the term false imprisonment to include false or unlawful arrest, the Supreme Court determined that the time of being held over for trial was the appropriate start date because

> false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held pursuant to such process-when, for example, he is bound over by a magistrate or arraigned on charges.  Thereafter, unlawful detention forms part of the damages for the "entirely distinct" tort of malicious

> prosecution, which remedies detention accompanied, not
> by absence of legal process, but by wrongful institution of
> legal process.

Id. at 1096 (citations omitted).  The Supreme Court specifically rejected the argument that the statute of limitations should begin to run on the date that the individual was released from custody or when the charges were dismissed.  Id.  The Supreme Court explained that

> [i]If there is a false arrest claim, damages for that claim
> cover the time of detention up until issuance of process or
> arraignment, but not more. From that point on, any
> damages recoverable must be based on a malicious
> prosecution claim and on the wrongful use of judicial
> process rather than detention itself. Thus, petitioner's
> contention that his false imprisonment ended upon his
> release from custody, after the State dropped the charges
> against him, must be rejected. It ended much earlier, when
> legal process was initiated against him, and the statute
> would have begun to run from that date[.]

Id. (citation and internal quotation marks omitted).

Although Graves cites the Wallace case in his motion, neither party provided the date that Joseph Haldeman appeared before a judge on the criminal charges and was held over for trial.  After the hearing, both parties filed supplemental briefs on that issue, as requested by this Court.  Graves filed an arrest report, which indicates that Joseph was arrested on August 22, 2003, and that his initial court appearance was on September 24, 2003.  This arrest report, however,

18

has not been authenticated.   Nevertheless, Plaintiffs do not contest that September 24, 2003, was the date that Joseph was brought before a judge on the criminal charges and held over for trial.   Plaintiffs, however, did not file their Complaint until December 28, 2005.   Accordingly, because more than two years passed since Joseph was held over for trial and the filing of his Complaint, this Court GRANTS Graves's motion with respect to Joseph Haldeman's claims for false arrest and false imprisonment.

As pointed out by Plaintiffs, however, because Graves did not move for summary judgment on Plaintiffs' malicious prosecution claim, such claim is still pending.   However, contrary to Plaintiffs' argument in their supplemental brief, Denise Haldeman's claim for false arrest is not still pending because criminal charges were never brought against her.   Thus, she was never bound over for trial, but instead was released from custody on the same day of the arrest.   The statute of limitations for her false arrest claim, therefore, ran prior to the filing of the instant complaint.

C.   Standing of the Haldeman Children

Graves asserts that the Haldeman Children do not have standing to bring claims arising from the alleged unlawful arrest and criminal proceedings

against their father, Joseph, because there is no evidence that they were injured due to their father being charged.

In order to have standing to bring a claim, a plaintiff must establish the following three elements:

> First, the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (citations and internal quotation marks omitted).

In response, Plaintiffs set forth all the other reasons that they are suing Graves, as set forth in this order, and cursorily state that use of fabricated photographs concerns the Haldeman Children.  Plaintiffs have not cited any law for this proposition or otherwise explained how the Haldeman Children suffered an injury in fact based upon the arrest, indictment, and charges brought against their father, including the use of allegedly doctored photographs.  The Haldeman Children had already been placed in State custody by the time the charges were brought against their father and Plaintiffs have cited no evidence to establish that

20

custody was continued solely because of the pending criminal proceedings.

Accordingly, this Court GRANTS Graves's motion on this issue and holds that the

Haldeman Children do not have standing to bring claims against Graves for

unlawful arrest and seizure of the Adult Plaintiffs or for the criminal proceedings

against Joseph.

      D.    <u>Qualified Immunity</u>

Defendant asserts that he is entitled to qualified immunity with respect

to Plaintiffs' Section 1983 claims based upon the Fourth Amendment and Due

Process Clause of the Fourteenth Amendment because he did not deprive the

Plaintiffs of any prompt post-deprivation judicial review, and he had a reasonable

belief that the Haldeman Children were in imminent harm if they were returned to

their parents.

"To establish that a state official is personally liable in an action under

42 U.S.C. § 1983, a plaintiff must show that 'the official, acting under color of state

law, caused the deprivation of a federal right.'" <u>Spoklie v. Montana</u>, 411 F.3d

1051, 1060 (9th Cir. 2005) (quoting <u>Hafer v. Melo</u>, 502 U.S. 21, 25 (1991)).  As

long as the official's "conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known," he or she

has qualified immunity from civil liability under § 1983. <u>Id.</u>  The following must

be determined in the analysis of a qualified immunity defense:  "(1) what right has

been violated; (2) whether that right was so 'clearly established' at the time of the

incident that a reasonable officer would have been aware of its constitutionality;

and (3) whether a reasonable public officer could have believed that the alleged

conduct was lawful."  Jensen v. City of Oxnard, 145 F.3d 1078, 1085 (9th Cir.

1998), cert. denied, 525 U.S. 1016 (1998).

      "A particular right is 'clearly established' if the 'contours of [that]

right [are] sufficiently clear that a reasonable official would understand that what he

is doing violates that right.'"  Id.; see also Devereaux v. Abbey, 263 F.3d 1070,

1074 (9th Cir. 2001) ("In essence, at the first step, the inquiry is whether the facts

alleged constitute a violation of the plaintiff's rights. If they do, then, at the second

step, the question is whether the defendant could nonetheless have reasonably but

erroneously believed that his or her conduct did not violate the plaintiff's rights.")

(citing Saucier v. Katz, 533 U.S. 194 (2001)).  The qualified immunity doctrine

protects government officials from their exercise of poor judgment, and fails to

protect only those who are "plainly incompetent or those who knowingly violate the

law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see also Hunter v. Bryant, 502

U.S. 224, 229 (1991) (The qualified immunity doctrine "gives ample room for

mistaken judgments by protecting all but the plainly incompetent or those who

knowingly violate the law.") (citation and internal quotation marks omitted).

"[T]he court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed [several] years after the fact." Hunter, 502 U.S. at 228.  The party asserting qualified immunity bears the burden of proving that the defense applies.  Benigni v. City of Hemet, 879 F.2d 473, 479 (9th Cir. 1988).

This Court found that Duty was entitled to qualified immunity for the initial seizure of the Haldeman Children in order to interview them.  This holding was based upon a recent Ninth Circuit case which held that

> [p]arents and children have a well-elaborated constitutional right to live together without governmental interference.  The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies.  Officials violate this right if they remove a child from the home absent information at the time of the seizure that establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.  The Fourth Amendment also protects children from removal from their homes absent such a showing.

Rogers v. County of San Joaquin, 487 F.3d 1288, 1294 (9th Cir. 2007) (citations and internal quotation marks omitted).

Plaintiffs, without having filed a motion for reconsideration on this issue, now assert that the above holding should not apply to Graves because it is a question for the jury, and it was inappropriate for this Court to make such a determination.  Plaintiffs assert that the existence of probable cause in Section 1983 claims is a question of fact for the jury.

Plaintiffs are mistaken.  This Court was not making a probable cause determination in the terms of arrest, which are the circumstances at issue in some of the cases relied upon by Plaintiffs.  Instead, this Court was making a determination of whether Duty was entitled to qualified immunity.  It is clearly within this Court's authority to make factual findings in order to determine whether a qualified immunity defense applies.  Indeed, it is well established that "[i]f a reasonable official could have believed that his actions were lawful, summary judgment on the basis of qualified immunity is appropriate. . . . Only if there be a genuine issue of fact that would preclude a grant of summary judgment, should the court let the case proceed to trial."  Hemphill v. Kincheloe, 987 F.2d 589, 592-93 (9th Cir. 1993) (citations omitted); see also Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993) ("The determination of whether the facts alleged could support a reasonable belief in the existence of probable cause or reasonable suspicion is also a question of law to be determined by the court") (citations omitted).  As recognized by the

24

Supreme Court, it is important to resolve immunity questions at the earliest possible

stage of litigation because qualified immunity "is an immunity from suit rather than

a mere defense to liability." <u>Hunter</u>, 502 U.S. at 227.

This Court did not make any credibility determinations in making a

finding that Duty was entitled to qualified immunity for the initial seizure for the

limited intrusion of an interview, as argued by Plaintiffs.  Instead, this Court

determined that the credibility of witnesses was not an issue since there was no

genuine issue of fact that Duty could have reasonably believed that her conduct in

seizing the Haldeman Children for the limited purpose of conducting a forensic

interview was lawful since Vanessa's allegations, in conjunction with the young age

of both children, and Vanessa's documented behavior, constituted allegations of

imminent serious bodily injury.  It was also objectively reasonable for Duty to

believe that an interview of each child was reasonably necessary to avert any further

sexual molestation that could possibly occur soon after the children were picked up

from school that day and there was no indication that if Duty left Vanessa at the

school while she went to Court to obtain a warrant that she would remain safe and

away from the presence of her accused father.  (<u>Id.</u>)  Therefore, Plaintiffs' argument

that this was an inappropriate factual determination is meritless.

Plaintiffs next argue that there was no exigency to seize the Haldeman Children because CPS ignored Golden's first call that was made months earlier on July 17, 2002. This argument, however, ignores the important fact that Vanessa's allegations made in October were the first allegations of inappropriate physical sexual contact by her father, whereas the previous call to CPS was based only upon Vanessa's sexualized behavior with other children. Thus, that there was no immediate response to the first call, does not demonstrate that there was no exigency to respond to the call made in October.

Therefore, like Duty, Graves is entitled to qualified immunity for the initial seizure of the Haldeman Children for the limited purpose of conducting a forensic interview. This is because even if Graves's belief that the Haldeman Children were in imminent danger was mistaken, it was objectively reasonable based upon the seriousness and specificity of then four-year-old Vanessa's allegations, and the young age of the children. See Act Up!, 988 F.2d at 873 ("If a reasonable officer could have believed that Appellants were justified under Giles in strip searching the Appellees, Appellants are entitled to qualified immunity. This is so notwithstanding that reasonable officers could disagree on this issue, because even officers who mistakenly conclude that reasonable suspicion is present are

entitled to immunity so long as that conclusion is objectively reasonable.")
(citations omitted).

As with Duty, however, Graves is not entitled to qualified immunity
for other conduct because there are questions of fact of whether Vanessa's
allegations were properly investigated and corroborated prior to continuing the
seizure of both children, and ordering a medical exam of Vanessa without a court
order, and whether it was reasonable to believe that both Benjamin and Vanessa
would likely experience serious bodily harm in the time that would be required to
obtain a warrant after the interviews had been completed.  There is also a genuine
issue of fact as to whether Duty's interview of Vanessa, which included an off-the-
record discussion with Graves, was so suggestive that Duty and Graves should have
known it would lead to false responses.  For these reasons, Graves's motion is
GRANTED IN PART with respect to finding that he is entitled to qualified
immunity for the initial seizure of the Haldeman Children for purposes of the
forensic interview and lack of investigation, and DENIED IN PART with respect to
the conduct set forth above.

E.    Equal Protection Claim

Graves argues that Plaintiffs' Section 1983 equal protection claim
against him should be dismissed because even if the child abuse claims against

27

Joseph were fabricated and the witnesses coerced to testify in a certain manner, Plaintiffs have not shown that Graves had any personal discriminatory animosity towards them.

In order to bring a claim against a police officer based upon a violation of the equal protection clause, the plaintiff must allege that the officer had some type of discriminatory intent based upon a protected class or show that there was an overtly discriminatory classification.  Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998) ("To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class.") (citations omitted); see also Benigni, 879 F.2d at 477 (citing Wayte v. United States, 470 U.S. 598, 608 (1985)).

Here, Plaintiffs have not even alleged that they are members of a protected class.  Even if they were, Plaintiffs have not alleged that the actions taken by Graves were done with discriminatory intent or were otherwise based on an unlawful standard or protected category.  There are no allegations in the First Amended Complaint that Graves took the alleged actions based on an improper motive.  In addition, Plaintiffs addressed only their alleged Fourth Amendment and Fourteenth Amended Due Process violations in their opposition and do not address

their Equal Protection Claim.  Accordingly, Plaintiffs' Section 1983 claims to the

extent they are based upon the Equal Protection Clause are dismissed and summary

judgment in GRANTED in favor of Graves on that claim.[2]

II.      State Law Claims

        A.      Qualified Privilege

        Graves argues that he is entitled to a qualified privilege for all of the

state law claims because there is no evidence that in performing his public duties he

was motivated by malice or an unlawful purpose.

> non-judicial governmental officials, when acting in the
> performance of their public duty, enjoy the protection of
> what has been termed a qualified or conditional privilege.
> This privilege effectively shields the official from
> liability, and not from the imposition of the suit itself, to
> the extent that the privilege is not abused and thereby lost.
> . . . in order for an action to lie against an official acting
> under a claim of privilege, it is essential that the injured
> party allege and prove, to the requisite degree, that the
> official had been motivated by malice and not by an
> otherwise proper purpose.

---

[2]Graves also asserts that to the extent Plaintiffs have alleged a negligent investigation claim pursuant to Section 1983, it should be dismissed.  In their opposition, Plaintiffs clarified that they are not attempting to bring such a claim. Accordingly, this Court will not address Graves's argument on this issue.

Towse v. State, 647 P.2d 696, 702 (Haw. 1982) (citations omitted).  "[T]he injured party [must] demonstrate by clear and convincing proof that those officials were stirred by malice and not by an otherwise proper purpose."  Id.

Plaintiffs allege that the Towse case is distinguishable because that case pertained to civil defamation claims and thus, it is not necessary to prove malice to overcome a claim of qualified privilege.  Although the Towse case involved a defamation claim, it also involved a state tort claim of false imprisonment.  Importantly, the Hawaii Supreme Court in Towse discussed the qualified privilege for public officials in general, and did not hold that such privilege was limited to defamation claims, as Plaintiffs suggest.  Instead, the court explained its reasoning for finding that public officials were entitled to a qualified privilege with respect to lawsuits for state torts, rather than being entitled to absolute immunity, which would bar the lawsuit entirely.  Id. at 701 (rejecting absolute immunity for state officials in performance of their duties because of a "desire to effectuate a balance between the interest of a maliciously injured plaintiff and a good faith public official.").

Furthermore, this Court has held that the qualified privilege as espoused in Towse may apply to state law claims for assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress, and

that malice is an element that must be proved.  Edenfield v. Estate of Willets, No.

Civ. 05-00418 SOM/BMK, 2006 WL 1041724, at *12 (D. Haw. April 14, 2006)

("For a tort action to lie against a nonjudicial government official, the injured party

must allege and demonstrate by clear and convincing proof that the official was

motivated by malice and not by an otherwise proper purpose.  When a public

official is motivated by malice, and not by an otherwise proper purpose, Hawaii law

provides that the cloak of immunity is lost and the official must defend the suit the

same as any other defendant.") (citations omitted).  Thus, this Court finds that,

contrary to Plaintiffs' arguments, malice must be pled in order to overcome a claim

of qualified privilege.

The Towse case is limited, however, to defamation claims in its

application of the reasonable man test as the definition for what constitutes malice.

In Towse, the court held that in order to establish malice when a qualified privilege

defense is at issue, the plaintiff must show that the defendant failed "to act as a

reasonable man under the circumstances, with due regard to the strength of his

belief, the grounds that he has to support it, and the importance of conveying the

information."  Id. at 703.  Recently, however, the Hawaii Supreme Court held that

this lower-standard reasonable man test for determining malice was adopted for use

in the defamation context, and was not applicable in a case where members of a

State board were claiming immunity pursuant to Hawaii Revised Statutes Section

26-35.5.  See Awakuni v. Awana, 165 P.3d 1027, 1041-42 (Haw. 2007) ("the

language of the test espoused in Towse . . . clearly was intended for purposes of

analyzing the qualified privilege in a claim for defamation, not for immunity

pursuant to HRS § 26-35.5. It is therefore apparent that the 'reasonable person' test

was adopted for use in the defamation context.").  The court so held because the

legislative history of the statute granting State board members immunity made it

"clear that the legislature did not intend for malice in this context to be defined by

the lower standard of the 'reasonable person' test[.]"  Id. at 1042.  Instead, the court

held that "the phrase 'malicious or improper purpose' [as used in the statute] should

be defined in its ordinary and usual sense."  Id.  The court then applied the

definition of malice from Black's Law Dictionary, which defined "malicious" as

"[s]ubstantially certain to cause injury" and "[w]ithout just cause or excuse[.]"  Id.

The court noted that Black's Law Dictionary defined "malice" as "[t]he intent,

without justification or excuse, to commit a wrongful act[,]" "reckless disregard of

the law or of a person's legal rights[,]" and "[i]ll will; wickedness of heart."  Id.

(citing Blacks's Law Dictionary 977 (8th ed. 2004)).

In addition, in Edenfield, this Court rejected the plaintiffs' claim that

the reasonable man test as espoused in Towse should apply to a non-defamation

claim, and stated that to hold that such a test did apply "would effectively remove the 'malice' requirement and run contrary to the Hawaii Supreme Court's admonition that only the most guilty of officials are liable for their tortious acts." 2006 WL 1041724 at *12.  Therefore, for purposes of a qualified privilege defense in a non-defamation claim, malice must be proven in order to overcome a claim of qualified privilege and malice is defined as acting without just cause or excuse or in reckless disregard of the law or of a person's legal rights.

Plaintiffs next assert that the existence of malice is generally a question for the jury.  However, the issue of malice is appropriate for determination by the court if the evidence surrounding a claim for malice is uncontroverted.  Towse, 47 P.2d at 703 (finding that summary judgment in favor of the public official had been properly granted since the record did not reflect that defendants had acted maliciously or for an improper purpose); see also Runnels v. Okamoto, 525 P.2d 1125, 1129 (1974).

Here, this Court cannot make a determination as a matter of law that Graves's actions were not conducted with just cause or not in reckless disregard for Plaintiffs' rights.  Plaintiffs' allegations are sufficient to create a genuine issue of fact of whether Graves acted without just cause or in reckless disregard of Plaintiffs' rights by allegedly determining that Vanessa should undergo a medical

exam without allegedly following DHS guidelines, allegedly fabricating

photographic evidence against Joseph Haldeman, and allegedly conspiring to bring

and continuing to bring criminal charges against Joseph based upon coerced,

manipulated and fabricated evidence.

For these reasons, Graves does not have a qualified privilege as a

matter of law with respect to the State law claims.

B.    Defamation Claim

Graves argues that he is immune from suit for a defamation claim

because he has a qualified privilege for actions taken in his capacity as a police

officer investigating alleged criminal conduct.

The Hawaii Supreme Court has established the following four elements

to sustain a claim for defamation:

> (1) a false and defamatory statement concerning another;
> (2) an unprivileged publication to a third party; (3) fault
> amounting at least to negligence on the part of the
> publisher [actual malice where the plaintiff is a public
> figure]; and (4) either actionability of the statement
> irrespective of special harm or the existence of special
> harm caused by the publication.

Gonsalves v. Nissan Motor Corp. in Haw., Ltd., 58 P.3d 1196, 1218 (Haw. 2002).

A qualified privilege "arises (1) when the author of a defamatory

statement reasonably acts in the discharge of some public or private duty, legal,

34

moral, or social and (2) where the publication concerns a subject matter in which the author and the recipients of the publication have a correlative interest or duty." Kainz v. Lussier, 667 P.2d 797, 801-02 (Haw. App. 1983) (citations omitted); see also Russell v. Am. Guild of Variety Artists, 497 P.2d 40, 44 (Haw. 1972) (a qualified privileged exists "when the author of the defamatory statement reasonably acts in the discharge of some public or private duty, legal, moral, or social, and where the publication concerns subject matter in which the author has an interest and the recipients of the publication a corresponding interest or duty.") (citation omitted).  Although a defendant must satisfy both of these requirements to find that a qualified privilege defense is available, this test "places emphasis on the reasonable action of the author of the publication and the corresponding interest between the author and the recipient."  Russell, 497 P.2d at 44.

Furthermore, as noted above, where a public official is involved, the plaintiff must show that the defendant failed "to act as a reasonable man under the circumstances, with due regard to the strength of his belief, the grounds that he has to support it, and the importance of conveying the information."  Towse, 47 P.2d at 703.

Neither party has cited to this Court in their briefs or in their concise statement of facts which statements were made specifically by Graves and under

what context.  At the hearing, Plaintiffs stated that all alleged defamatory statements made by Graves were contained in Exhibit P of their concise statement of facts. Exhibit P is a police report apparently made by Graves dated October 29, 2002, which summarizes his discussions with the pre-school personnel and summarizes Vanessa's interview.  Plaintiffs have not pointed this Court to the evidence which authenticates this report.  See Fed. R. Evid. 901, 902.  Even if this report had been properly authenticated, and assuming it contained false statements, Plaintiffs have not identified the third party to whom this report was published.  There is no evidence in the record that this report was provided to anyone, other than possibly the person who signed the report as being approved.  The report having not been authenticated, this Court assumes that the person who approved the report was Graves's superior.  That being the case, Plaintiffs have provided no evidence that such publication, assuming there was one, was unprivileged.

Accordingly, this Court GRANTS Graves's motion with respect to the defamation claim and that claim is hereby dismissed as to Graves.

C.    Hawaii Revised Statute Section 350-3

Defendant Donald Cupp filed a motion for summary judgment arguing that all state law claims against him should be dismissed because he is entitled to immunity pursuant to Hawaii Revised Statute Section 350-3.  (Doc. # 778.)  Graves

36

filed a substantive joinder of Cupp's motion on this argument.  Neither party addressed any facts or provided an analysis to this Court regarding which conduct fell within Graves's scope of employment and which did not.

In the Order Granting in Part and Denying in Part Donald Cupp's Motion for Summary Judgment on this issue, this Court held that Cupp, like Defendant Karen Duty, was entitled to immunity under this statute for the actions of seizing the children for the purpose of conducting the forensic interviews.  Graves is likewise entitled to such immunity as it was clearly within the scope of his duties.  In addition, like Duty, Graves has immunity for the State law claims based upon his conduct of allegedly making an inadequate investigation into Vanessa's allegations while at the pre-school, and his interview of Benjamin.

This Court also found that the allegations that Duty coached Vanessa in the car by using the words "suck," "private parts," "secrets," "daddy" and "mommy," was insufficient to create a genuine issue of fact that Duty was acting outside the scope of her duties.  Indeed, even if Duty said such words, these words had already been used by Vanessa, on her own, at her pre-school; Duty was merely repeating the words.  Likewise, even if Graves used the words "my daddy, " "suck," "private parts," "private touching," and "tinkler" during the interview of Vanessa, Vanessa had already used those words.  Accordingly, there is no evidence that

Graves was acting outside the scope of duties by allegedly repeating the words back
to Vanessa.  Plaintiffs have produced no evidence to show that any of the above
conduct was outside of the normal risks to be borne by the County of Hawaii, or
were outside of the same general nature as that authorized, or incidental to the
conduct authorized.  Therefore, like Duty, Graves has immunity for allegations of
coaching Vanessa during the interview based upon repeating words already used by
Vanessa herself.

However, as with Duty, there is a question of fact as to whether
allowing an intrusive medical exam to be performed on Vanessa without prior
consent of at least her mother or a court order, or having interviewed her mother,
was within the scope of Graves's duties.  In addition, alleged conduct of fabricating
photographic evidence against Joseph Haldeman, and conspiring to bring and
continuing to bring criminal charges against Joseph based upon allegedly coerced,
manipulated and fabricated evidence would not be within the scope of Graves's
duties.

Accordingly, this Court GRANTS IN PART AND DENIES IN PART
Graves's motion on this issue.

<u>CONCLUSION</u>

For the reasons stated above, the Court GRANTS IN PART AND DENIES IN PART Defendant/Cross-Claim Defendant Alexander Graves's Motion for Summary Judgment.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, April 15, 2008.



_____
David Alan Ezra
United States District Judge

<u>Vanessa Haldeman, et al. vs. Ruth Golden, et al.</u>, Civil No. 05-00810 DAE-KSC; ORDER GRANTING IN PART AND DENYING IN PART WITHOUT PREJUDICE DEFENDANT ALEXANDER GRAVES'S MOTION FOR SUMMARY JUDGMENT