IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| VANESSA HALDEMAN & BENJAMIN HALDEMAN, BY THEIR PARENTS *AS NEXT FRIENDS*; JOSEPH & DENISE HALDEMAN; JOSEPH HALDEMAN, individually; DENISE HALDEMAN, individually; JERRY HALDEMAN, individually; & CAROL HALDEMAN, individually, | ) ) ) ) ) ) ) ) ) ) ) | CV NO 05-00810 DAE-KSC |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| RUTH GOLDEN, in her individual capacity; PATRICIA NAVARRO, in her individual capacity; CAROLINE HAYASHI, in her individual capacity; CYNTHIA NOEL, in her individual capacity; UNIVERSITY OF NATIONS PRE-SCHOOL, a Private Agency; THE UNIVERSITY OF NATIONS as Respondeat Superior; ALEXANDER GRAVES, in his individual capacity; COUNTY OF HAWAII, a municipal entity; KAREN DUTY, in her individual capacity; DONALD CUPP, in his individual capacity; JILL ACERO, in her individual capacity; BOBBETTE STRAUSS, in her individual capacity; CHILD PROTECTIVE SERVICES, an agency of the | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

Department of Human Services;        )
DEPARTMENT OF HUMAN                  )
SERVICES [DHS], State of Hawaii;     )
LILLIAN KOLLER, DIRECTOR             )
OF DHS, in her official capacity;    )
ANDREA MCCOLLUM, in her              )
individual and professional capacity; )
LEGAL AID SOCIETY OF                 )
HAWAII, a Private Non-Profit         )
Agency; DAVID KAULIA, in his         )
individual capacity; COLLEEN         )
CLARK, in her individual and         )
professional capacity; CHILD AND     )
FAMILY SERVICE, a Private Non-       )
Profit Agency; JOINTLY AND           )
SEVERALLY,                           )
                                     )
                Defendants.          )
_____        )


ORDER GRANTING DEFENDANT ACERO'S (nka FORBES) MOTION FOR
SUMMARY JUDGMENT AND ORDER DENYING ACERO'S MOTION TO
STRIKE PLAINTIFFS' CONCISE STATEMENT AS MOOT

The Court heard Defendant Acero's motion for summary judgment

on April 14, 2008.  (Doc. # 786.)  William Deeley, Esq., and John Winnicki, Esq.,

appeared at the hearing on behalf of Plaintiffs; Julie A. Passa, Deputy Attorney

General, appeared at the hearing on behalf of Defendant Donald Cupp; John R.

Molay, Deputy Attorney General, appeared at the hearing on behalf of Defendant

Karen Duty; Joseph K. Kamelamela, Deputy Corporation Counsel, appeared at the

hearing on behalf of Defendant Alexander Graves and the County of Hawaii; E.

2

Mason Martin, III, Esq., appeared at the hearing on behalf of Defendants Ruth Golden, Patricia Navarro, Caroline Hayashi, Cynthia Noel, University of Nations Pre-School, and The University of the Nations; and John P. Gillmor and Ryan S. Endo, Deputy Attorneys General, appeared at the hearing on behalf of Defendant Jill Acero; April Luria, Esq., appeared at the hearing on behalf of Defendants Child and Family Service and Colleen Clark; and William J. Nagle, Esq., appeared at the hearing on behalf of Defendants Bobbette Strauss and the Institute for Family Enrichment.  After reviewing the motion and the supporting and opposing memoranda, the Court GRANTS Defendant Acero's Motion for Summary Judgment.  All remaining claims by all remaining Plaintiffs against Defendant Acero are hereby dismissed.

Pursuant to Local Rule 7.2(d), the Motion to Strike (Doc. # 872.) was decided without a hearing.  Acero sought to strike Exhibit I , which is a report of Dr. Randy Rand.  This Court did not rely on Dr. Rand's opinion in determining the motion for summary judgment.  In addition, this Court determined the motion for summary judgment in Acero's favor.  Accordingly, after reviewing the motion and the supporting and opposing memoranda, this Court DENIES the motion to strike AS MOOT.  This Court reminds all counsel that in all Court filings, they must

comply with both the Federal Rules of Civil Procedure and this district court's local rules.

## BACKGROUND

Defendant Acero was a social worker level IV for the Child Protective Services Division of the Hawaii Department of Human Services ("CPS"). Many of the facts of this case are set forth in detail in this Court's Order Granting in Part and Denying in Part Defendant Karen Duty's Motion for Summary Judgment ("Duty Order") (Doc. # 817), some of which are repeated herein.

In October 2002, Vanessa and Benjamin Haldeman (the "Haldeman Children") were removed from the custody of their parents under suspicion of sexual abuse of Vanessa by her father, Joseph. On October 29, 2002, Defendant social worker Donald Cupp filed a Petition for Temporary Custody in the Family Court of the Third Circuit. The Family Court held a hearing on the petition on October 31, 2002. On December 12, 2002, the Family Court issued an order awarding temporary foster custody of the children to the State, effective October 31, 2002.

After the petition had been filed in Family Court, in November 2002, the case was transferred from Defendants Karen Duty and Donald Cupp to Defendant Acero, and she became the case manager for the Haldeman family. As

4

the case manager, Defendant Acero was responsible for the health, safety, welfare, and education of the Haldeman Children while they were in foster care in Kona, Hawaii.

When Acero was first assigned to the case, the Haldeman Children were already living with foster parent Elaine Coates, an older single woman. Former Defendant Andrea McCollum had been appointed as the guardian ad litem and the children were seeing therapist Colleen Clark of Child and Family Services on a weekly basis. Acero does not recall McCollum nor Clark informing her of any concerns with the foster care placement that would need her immediate attention.

At some point, Acero visited Elaine Coates and for the first time met Benjamin and Vanessa. Coates complained that Benjamin was disobedient and Benjamin had complained about doing chores, which included caring for the pet pig. Acero reviewed reports in Benjamin's file, which indicated that he had a low anger and frustration threshold. For these reasons, Acero decided to relocate the children. Acero claims that she contacted virtually every licensed foster home in the west Hawaii area and that David and Cindy Kaulia were the only licensed foster home ready and willing to care for both Haldeman Children, knowing that Vanessa had made allegations of sexual abuse and that Benjamin presented

5

behavioral problems.  The children were relocated to the Kaulias' home on February 13, 2003.

Acero visited the children several times at the Kaulias' home.  She thought the children were content.  Although she discussed with each Vanessa and Benjamin their living conditions and relationship with the Kaulias, neither child complained of mistreatment or abuse.  Acero did not notice any unusual marks or bruises on either child.

On April 7, 2003, Vanessa reported that she rode in the back of a pick-up truck and Cindy Kaulia confirmed this.  Cindy explained that Benjamin had vomited in the car and thus, she sat both children in the back of the truck until they reached their destination.  This incident occurred after the Kaulias had put the children in the back of the pick-up truck once before on February 21, 2003, and Acero had told them that it was unsafe and unacceptable to do so.  Acero informed the foster care licensing division of the State about these incidents and the Kaulias were placed on a corrective action plan, where they were required to submit a written report on the research they conducted on what can happen to children who ride in the back of trucks.

On May 16, 2003, Benjamin told Acero that the Kaulias' son pinned him down sometimes.  Acero stated that she would inform David Kaulia of

6

Benjamin's concerns.  On September 19, 2003, Acero was informed that David

Kaulia had taken the children to see the movie "Jeepers Creepers," which is an R

rated suspense/horror film.  Acero stated that the Kaulias denied this.  Acero

believed the Kaulias because they had been forthcoming in the past when they

admitted to a second incident of the children riding in the back of the truck.  Acero

did not consider any of these events as reason to remove the Haldeman Children

from the Kaulia's home.

In her deposition taken in October 2006, Vanessa testified that while

she was living with the Kaulias, David Kaulia touched her "private parts" while

they were in the movie theater watching "Jeepers Creepers."  Vanessa testified that

David's hand came over her shoulder and he reached down and started to feel

around.  Vanessa testified that Benjamin saw this occur.  Vanessa testified that on

another occasion, she was in David's bedroom and he was holding her against his

chest and touching around her "private parts," while she had her clothes on.

Benjamin walked in and asked what they were doing and Vanessa responded that

they were having sex.  Vanessa testified that David touched her approximately

three other times, and that each of those times occurred in David's bedroom in the

home.  Vanessa is not sure if she told Bobbette Strauss about this alleged conduct

because David had told her to keep it a secret.  Vanessa stated that she did tell

Cindy Kaulia.  Vanessa testified that she told her mother, Denise, that David touched her and that she told her mother this when they were at the YMCA and she was still living with the Kaulias.  Vanessa also testified that she told her grandparents about the touching, after she had been placed in their custody in October 2003.  She also told Susan Strom, who is her grandmother on her mother's side.  Vanessa also testified that the Kaulias' son had squeezed Benjamin's head between his knees.

After having his memory refreshed, Benjamin testified in his deposition that he recalled seeing David "playing with his sister's crotch" at the movie theater, and walking into David's bedroom when David was putting his hands all over Vanessa and "just rubbing her."  Both Benjamin and Vanessa testified that David said not to tell anyone because he could get in trouble.  Benjamin thought that it did not look right and he immediately told Cindy and Cindy said that Vanessa is "sick in the head."  Benjamin also recalled the Kaulias' son putting his head between his knees and squeezing, shoving him, and pinning him to the ground, and that Cindy Kaulia did not care.

In May 2003, Jerry and Carol Haldeman, the children's grandparents, filed a petition requesting to be appointed co-guardians.  On May 1, 2003, Acero testified in Family Court as an expert in the area of a social worker for child

protective services, and submitted an expert report to the court, as required by the court.  The report Acero submitted was entitled the Safe Family Home Report dated April 25, 2003.  Prior to testifying in court, Acero reviewed the videotape of Defendant social worker Karen Duty's interview of Vanessa that was conducted in October 2002.  Acero does not recall reviewing the tape of Benjamin's interview with Defendant former police detective Alexander Graves.  Acero also had consulted with Bobbette Strauss, Colleen Clark, the children's school behavioral health therapist, and representatives of the Department of Health prior to testifying.  Acero also spoke with the Kaulias, Elaine Coates, the Haldeman Children and their physician.  Acero reviewed the written report of Plaintiffs' expert Jack Annon, and CPS's psychology expert Steven Choy.

> In Jack Annon's report that Acero reviewed, Annon opined that
>
>> there is a high probability that Vanessa does not have an independent actual memory for many of the events that she has described [in her 2002 interview with Duty] as to which actually happened and to which are fantasies. . . . [and] due to the numerous conversations, interviews, and pressures placed upon Vanessa, and the reinforcement that she has received, at this point [he] d[id] not believe that any further interviewing of Vanessa regarding these issues will produce any new information that can be independently substantiated.

(Pls.' Ex. F.)  Steven Choy opined in his report that

9

> [w]hile the information from the videotape interview of
> Vanessa makes it difficult to clearly determine if Vanessa
> was sexually abused by her father, there were many
> factors that indicate that she was at least exposed to
> inappropriate adult sexual acts and there are probable
> daughter-father problems that need to be further
> explored.

(Pls.' Ex. G.)

After reviewing all of this information, Acero stated in the 2003 Safe Family Home Report that Vanessa had been exposed to "chronic sexual abuse by her father" and the mother was not protective and she recommended that foster custody be awarded to CPS.  Acero testified in Family Court that she believed that Vanessa had been sexually abused by Joseph and that Benjamin had been physically abused by Joseph, and Denise failed to protect Benjamin and exposed Vanessa to pornography.  In her November 2007 deposition, however, Acero stated that she believed that the children had been traumatized in some manner and she believed Vanessa's allegations, but that she had not formed a conclusion as to whether Vanessa had been sexually molested by her father.

In October 2003, the Family Court appointed Jerry and Carol Haldeman as co-guardians.  The Haldeman family moved, and in November 2003, the case was transferred to the department of human services in  Washington State.

In May 2004, CPS received a report that Vanessa had been sexually abused by her former foster father, David Kaulia.  Karen Duty assigned Nicole Vahia to the case.  Duty and Vahia attempted to locate the Haldeman Children for an interview.  They were unable to locate the Haldeman Children and closed the case because they were unable to locate the alleged victims.

Plaintiffs produced documents from State files which show that in 1994, the Family Court had entered an order of protection against David Kaulia ordering that he shall not threaten or abuse his daughter, who was a minor, or any other person residing with him, he had to vacate the residence, and could have no visitation with his daughter.  In a petition to the court, David's daughter alleged that her uncle had molested her and that her dad told all of his friends about it, laughed about it,  made fun of her, and called her names such as "whore" and "bitch."  She also alleged that he had hit her older sister and mom, and had threatened her and her mother, stating that he was going to shoot her and shoot her mom.

Cindy Kaulia also filed a petition around this time, which stated that David called her names, had tried to ram her off the road with the school bus he was driving, and later laughed and bragged about it.  Cindy stated that she had left the residence and took her younger son with her.  She felt that David drank too

11

much and was abusing her psychologically.  Cindy indicated that David had been

charged with abuse of her and her daughter previously in July 1994, and that she

had filed a restraining order against him based on other conduct in 1993.

Later, in 1995, CPS was called in to provide home based services to

the Kaulia family.  The case was referred to CPS in October 1995 because David

had lifted his daughter by the hair, dropped her to the floor, and backed or

slammed her up against a wall.  The case manager's notes also report that David

had been required to leave the home for seven months in 1994.  The report also

states that David was the victim of child abuse, and is a drug user who has been

physically and verbally abusive, but was able to remain sober for a year.  The

report notes that David is kind and dedicated to his family.  The case involving the

Kaulias was apparently closed in December 1995.

Acero has testified that she had no knowledge of this history, or any

other history of the Kaulia family that would have made them unsuitable foster

parents.  Acero has stated that CPS has a separate division that determines fitness

and suitability of foster parents and that as a case manager it is not her

responsibility to revisit the licensing investigation, and the licensing file is not

routinely made available to her.

On December 28, 2005, Plaintiffs filed the instant lawsuit.  Plaintiffs

later filed a First Amended Complaint bringing a 42 U.S.C. § 1983 claim arguing

that their due process and equal protection rights were violated and for conspiracy

(Counts One and Two).  Plaintiffs also allege state law claims of negligence, gross

negligence, defamation, intentional infliction of emotional distress, and invasion of

privacy (Counts Four, Five, Six, Seven and Ten, respectively).  Defendant Acero

filed a motion to dismiss on September 7, 2006, arguing that she is immune from

suit.  On October 4, 2006, Defendant Acero filed a supplemental memorandum

arguing that all federal claims made by the adult plaintiffs should be dismissed

because the statute of limitations has run.  On December 12, 2006, this Court held

that Defendant Acero was immune from suit to the extent Counts One and Two,

pursuant to Section 1983, were based upon conspiring to present false testimony in

a court of law.  This Court also held that Defendant Acero was immune from suit

pursuant to Hawaii Revised Statute section 350-3 for the state law claims (Counts

Four, Five, Six, Seven and Ten) for most of the conduct alleged by Plaintiffs

because such conduct fell within the scope of her duties.  Defendant, however, was

not immune from suit for the allegations that she engaged in a conspiracy to

develop false criminal charges against Joseph Haldeman, since that was outside the

scope of her duties.  This Court dismissed the Adult Plaintiffs' claims against

13

Acero based upon her alleged failure to protect the children while in foster care because foster care ended in October 2003, and therefore, the Adult Plaintiffs' claims were barred by the statute of limitations.

On January 30, 2008, Defendant Acero filed the instant motion for summary judgment, seeking judgment in her favor on the Section 1983 claims by the Haldeman Children, and all state law claims based upon her alleged involvement in a conspiracy to develop false criminal charges against Joseph Haldeman.  Plaintiffs filed an opposition on March 27, 2008, and Defendant filed a reply on April 3, 2008.

<u>STANDARD OF REVIEW</u>

Rule 56 requires summary judgment to be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>see</u> <u>also</u> <u>Porter v. Cal. Dep't of Corrections</u>, 419 F.3d 885, 891 (9th Cir. 2005); <u>Addisu v. Fred Meyer, Inc.</u>, 198 F.3d 1130, 1134 (9th Cir. 2000).  A main purpose of summary judgment is to dispose of factually unsupported claims and defenses.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).

14

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See id. at 323.  A moving party without the ultimate burden of persuasion at trial–usually, but not always, the defendant–has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls upon the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" and may not rely on the mere allegations in the pleadings.  Porter, 419 F.3d  at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  In setting forth "specific facts," the nonmoving party may not meet its burden on a summary judgment motion by making general references to evidence without page or line numbers.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary judgment, the court shall have no independent duty to search and consider any part

15

of the court record not otherwise referenced in the separate concise statements of the parties.").  "[A]t least some 'significant probative evidence'" must be produced.  T.W. Elec. Serv., 809 F.2d at 630  (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)).  "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."  Addisu, 198 F.3d at 1134.

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact."  T.W. Elec. Serv., 809 F.2d at 631.  In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party.  Porter, 419 F.3d at 891.  The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage.  Id.  However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party.  T.W. Elec. Serv., 809 F.2d at 631.

DISCUSSION

16

I.      Section 1983 Claims

        A.      Family Court Filings

        It is undisputed that Acero was not involved with the initial seizure and interviews of the Haldeman Children.  Plaintiffs assert that Acero is liable for Constitutional violations because she prevented the return of the Haldeman Children by failing to evaluate the validity of the evidence which led to the initial seizure of the children and report its inadequacy.  Plaintiffs also argue Acero reviewed Duty's interview of Vanessa, failed to recognize that it was inadequate to support State custody of the children, failed to report such inadequacy to the Family Court, and instead testified that she believed that Vanessa was molested by Joseph.  Finally, Plaintiffs' Section 1983 claims against Acero are based upon allegations that she conspired with others to prevent the return of the Haldeman Children to their parents.

        Acero argues that Plaintiffs cannot maintain their Section 1983 claims against her because there is no evidence that she personally participated in the initial decision to take custody of the children, and at the time she became involved there was a court order in effect granting temporary foster custody to the State, which she had no reason to doubt.  This Court agrees.

17

With respect to Plaintiffs' substantive due process claims, "[i]n order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation." Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).

Plaintiffs' argument fails as a matter of law because Acero has produced evidence which establishes that she did not have a responsibility to re-evaluate the past decision and recommendation to place the Haldeman Children into State custody. Plaintiffs have presented no evidence to the contrary. There is no evidence in the record that Acero ever had a duty to make an independent evaluation regarding whether the initial seizure of the Haldeman Children was proper.

Furthermore, prior to Acero becoming the case manager, the Family Court had held a hearing on the petition for temporary foster custody. Plaintiffs presented no evidence that could create a genuine issue of fact that Acero should have believed that the Family Court's decision was improper or was based upon allegedly coerced, manipulated, and fabricated evidence. Specifically, although Acero reviewed the videotape of Vanessa's interview, there is no evidence that she reviewed Benjamin's interview also, and thereafter compared it to the filings made by Defendants Duty and Cupp in Family Court. Therefore, although this Court has

18

held that there is a question of fact as to whether Defendants Duty and Cupp have qualified immunity for the filing of the petition in Family Court based upon the possibility that it contained false statements, Plaintiffs have not presented any evidence which shows that Acero realized or should have known that the petition upon which the Family Court decision was based may have contained false evidence.  Moreover, Plaintiffs have not asserted that Acero somehow prevented them from returning to the Family Court to argue that its initial determination was incorrect.

Plaintiffs next argue that Acero had a duty to evaluate the evidence upon which the seizure was based when she was called to testify as an expert witness in Family Court proceedings in May 2003, and she should have used that opportunity to inform the Family Court of the manipulative nature of Duty's interview of Vanessa.  This argument fails because Plaintiffs cannot show that Acero's alleged failure caused a Constitutional deprivation of familial rights.

"The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law[.]"  Rogers v. County of San Joaquin, 487 F.3d 1288, 1294 (9th Cir. 2007).  Procedural due process requires that individuals have an opportunity to be heard, present evidence, and confront the witnesses against them.  Jenkins v. McKeithen, 395 U.S. 411, 428, 429 (1969)

("We have frequently emphasized that the right to confront and cross-examine

witnesses is a fundamental aspect of procedural due process. . . . The right to

present evidence is, of course, essential to the fair hearing required by the Due

Process Clause.") (citations omitted).  Here, with respect to claims against Acero,

Plaintiffs received the procedural due process to which they were entitled.

First, this Court has already held that Acero is immune from suit for

her in-court testimony.  Second, Acero was testifying as an expert witness and

provided the Family Court with her opinion on whether or not the Haldeman

Children were abused.  It was the Family Court's prerogative to make the final

determination of whether there was enough evidence to support a claim of abuse

such that the State should continue to have custody of the children.  Acero was

subjected to cross-examination regarding the basis for her opinion.  Part of that

cross-examination and presentation to the Family Court included submitting

Plaintiffs' expert report from Dr. Annon, which questioned the validity of

Vanessa's allegations made during Duty's interview, and discussed how Duty's

conduct may have led to Vanessa providing the accusations that she made.  Acero

explained that her opinion was based upon more than just the interview of Vanessa.

After being presented with all of the evidence, the Family Court ruled that the State

should continue to have custody of the children.  Therefore, even if Plaintiffs could

show that Acero formed her opinion regarding molestation of Vanessa with

deliberate indifference to the alleged manipulation of Vanessa's testimony,

Plaintiffs have not explained how their opportunity and effective cross-

examination of Acero in the Family Court proceedings, which pointed out the

weaknesses of her opinion, was not procedural due process of law.  Plaintiffs have

not alleged that any other procedural due process was lacking.

          In addition, Plaintiffs have presented no evidence which shows that

Acero presented possibly fabricated evidence in the 2003 Family Safe Home

Report that she filed in the Family Court, and even if she had, Plaintiffs have not

shown that this led or could have led to a deprivation of their Constitutional rights.

Hawaii Revised Statute Section 587-40(d) provides that

> [a] written report submitted under this section shall be
> admissible and may be relied upon to the extent of its
> probative value in any proceeding under this chapter;
> provided that the person or persons who prepared the
> report may be subject to direct and cross-examination as
> to any matter in the report, unless the person is
> unavailable.

Thus, although Acero may have been wrong in her opinion that she set forth in her

report that Vanessa had been sexually abused by her father and although in her

recent deposition Acero has backed-off from that opinion and stated instead that

she believes the children had been traumatized in some manner, the Family Court

21

Judge had the opportunity to assess Acero's credibility, credentials, and reliability,

during her cross-examination, and assess the evidence submitted by Plaintiffs that

pointed out the problems with Vanessa's interview.[1]  Thus, the Family Court Judge

was in a position to make a determination of the probative value of the Safe Family

Home Report filed by Acero.

   With respect to the conspiracy claim, Plaintiffs assert that Acero's

participation in mandated meetings and her uncritical acceptance of the theory that

sexual abuse occurred creates a permissible inference of conspiracy.

> A civil conspiracy is a combination of two or more
> persons who, by some concerted action, intend to
> accomplish some unlawful objective for the purpose of
> harming another which results in damage.  To be liable,
> each participant in the conspiracy need not know the
> exact details of the plan, but each participant must at least
> share the common objective of the conspiracy.  A
> defendant's knowledge of and participation in a
> conspiracy may be inferred from circumstantial evidence
> and from evidence of the defendant's actions.

---

[1] This Court notes that this is different from the Safe Family Home Report
that Defendant Donald Cupp filed in 2002, because no evidence was presented to
this Court that Cupp was subjected to cross-examination regarding his report prior
to the Family Court's decision to grant custody to the State, or that the Family
Court had been provided all of the facts regarding the interviews of the children,
including copies of the videotapes or transcripts of the interviews such that the
Family Court could make credibility determinations or form its own opinion on the
matter prior to granting initial custody to the State in 2002.

Gilbrook v. City of Westminster, 177 F.3d 839, 856-57 (9th Cir. 1999) (citations omitted).

Here, Plaintiffs have not presented enough facts to show that there is a genuine issue of fact as to whether Acero shared a common objective with someone.  For example, this Court found that the conspiracy claim with respect to Cupp and Duty survived summary judgment because the filings they made in Family Court contained misrepresentations of fact regarding Benjamin's alleged corroboration of Vanessa's major allegations of sexual abuse, and yet both Duty and Cupp continued to claim that Benjamin corroborated Vanessa's allegations even in their filings with this Court.  This type of evidence, however, is not present with respect to Acero.  Plaintiffs' entire argument on this issue centers around Acero attending mandated case conferences and opining that Vanessa had been molested and being subject to cross-examination on that opinion.  There is no evidence from which it can be inferred that Acero had a meeting of the minds with any other defendant in this case, and that she had an intent to accomplish an unlawful action.

Accordingly, Acero's motion for summary judgment on the remaining Section 1983 claims pertaining to the above conduct is GRANTED.

B.    Placement in the Kaulia Foster Care Home

Relying on Youngberg v. Romeo, 457 U.S. 307 (1982), Plaintiffs argue that Acero violated their Constitutional rights by placing the Haldeman Children in the Kaulias' home because the State should have known that the Haldeman Children may become subject to abuse at that foster home, and therefore, Acero breached the professional judgment standard of care.

In Youngberg, the Supreme Court held that a "decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 323. Applying this standard in a foster care situation, the Tenth Circuit held that "'[f]ailure to exercise professional judgment' does not mean mere negligence as we understand Youngberg; while it does not require actual knowledge the children will be harmed, it implies abdication of the duty to act professionally in making the placements." Yvonne L., By and Through Lewis v. N.M. Dep't of Human Servs., 959 F.2d 883, 894 (10th Cir. 1992); but see Kaho`ohanohano v. Dep't of Human Servs. State of Haw., 178 P.3d 538, 572 (Haw. 2008) (rejecting the professional

24

judgment standard of care for claims of state law violations, where Constitutional

violations are not at issue).

Even if the State should have known that the Kaulias were not

appropriate foster care parents, the State's knowledge cannot be imputed to Acero,

who is being sued in her individual capacity.  Instead, that claim is more

appropriately brought against the State in State Court.  See Kaho`ohanohano, 178

P.3d 538.  Plaintiffs presented no evidence that Acero knew or should have known

of David Kaulia's history.  Acero presented evidence that a different division

within CPS licenses the foster care families and that at the time she placed the

children with the Kaulias they had been licensed as a foster care family.  Plaintiffs

presented no evidence that Acero was obligated to question or confirm the

licensing of the Kaulias.  Accordingly, there is no genuine issue of fact regarding

Acero's decision to initially place the children with the Kaulias.

Plaintiffs next argue that because Acero was aware was that the

children rode in the back of a pick-up truck on two occasions, that the Kaulias' son

had pinned Benjamin down, and that they had been taken to an R-rated horror film,

there is a question of fact for the jury as to whether Acero's conduct in leaving the

children in that home was a substantial departure from accepted professional

judgment.  However, Plaintiffs have not pointed this Court to any evidence which

25

shows what the accepted professional judgment standard is in such a situation.

Indeed, Plaintiffs have cited no cases which show that these types of incidents

would require removal from the home, such that to leave the children in that home,

when no other home was available, was a "substantial departure" from the accepted

standard.  Moreover, Acero presented evidence that each of these reported

instances were addressed with the Kaulias and there was no other reports that this

type of conduct continued to occur.  In addition, thrust of the Plaintiffs' claims

centers on allegations of sexual abuse by David and there is no evidence in the

record that Acero was ever made aware of allegations of sexual abuse by David.

Therefore, Plaintiffs have not created a genuine issue of fact as to whether Acero's

decision not to remove the Haldeman Children from the Kaulias' care was a

substantial departure from accepted professional judgment.

    For these reasons, Acero's motion for summary judgment on the

Section 1983 claims is GRANTED.

II.    State Law Claims Based Upon Alleged Falsification of Evidence

    This Court previously found that Acero was not immune from suit

based upon allegations that she fabricated evidence in a conspiracy to bring

charges against Joseph Haldeman.  Acero has denied any involvement with any

alleged fabricated evidence used against Joseph Haldeman.  Plaintiffs have not

presented any evidence that Acero fabricated any evidence in relation to the

criminal charges brought against Joseph.  Accordingly, Acero's motion on this

issue is now GRANTED.

CONCLUSION

For the reasons stated above, the Court GRANTS Defendant Acero's

Motion for Summary Judgment.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, April 29, 2008.



_____
David Alan Ezra
United States District Judge

Haldeman, et al. v. Golden, et al., CV No. 05-00810 DAE-KSC; ORDER
GRANTING DEFENDANT ACERO'S (nka FORBES) MOTION FOR
SUMMARY JUDGMENT AND ORDER DENYING ACERO'S MOTION TO
STRIKE PLAINTIFFS' CONCISE STATEMENT AS MOOT